Natalie Marcin SBN#351072
EarthSpotter
3209 Brant Street
San Diego, CA 92103
Email: natalie@earthspotter.org
Telephone: (619) 320 5270

Adam D. Brumm, Esq. SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email: adam@edendefenders.org

*Attorneys for Plaintiffs EarthSpotter and Central Valley Eden Environmental Defenders, LLC*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EarthSpotter, a California non-profit corporation; Central Valley Eden Environmental Defenders, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> Thunderbolt Wood Treating Co., Inc., a California Corporation, <br><br> Defendant. | Case No. 26-735 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

1

EarthSpotter and Central Valley Eden Environmental Defenders, LLC ("EDEN") (collectively, "Plaintiffs") by and through counsel, hereby allege:

## I.        Jurisdiction and Venue

1.        Plaintiffs bring a civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). 33 U.S.C. § 1365. Under 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201, this Court has subject matter jurisdiction over the parties and this action.

2.        On February 18, 2026, Plaintiffs personally served a 60-day notice letter on Thunderbolt Wood Treating Co., Inc. ("Defendant " or "Thunderbolt"). Thunderbolt is the owner and/or operator of the industrial manufacturing facility located at 3400 Patterson Rd, Riverbank, California 95367 ("Facility"). The Notice Letter detailed the Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. Order 2014-0057-DWQ as amended in 2015 and 2018* ("Permit"). A true and correct copy of the Notice Letter and its enclosures is attached as **Exhibit 1** and incorporated herein.[1]

3.        Plaintiffs' process server mailed the Notice Letter via United States mail to the Defendant's Agent for Service of Process, located at the Facility's address.

4.        Pursuant to 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A), Plaintiffs mailed the Notice Letter to (1) the Administrator of the Environmental Protection Agency ("EPA"), (2) the Regional Administrator of EPA Region IX, (3) the Executive Officer of the California State Water Resources Control Board ("State Water Board"), and (4) the Executive Officer of the Central Valley Regional Water Quality Control Board ("Regional Board").

---

[1]Claims and allegations not pursued in this pleading have been redacted from the Notice Letter for clarity. The RCRA claims are not yet ripe.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

5. More than sixty (60) days have passed since the Notice Letter was served on the Defendant and mailed to the required parties. On information and belief, neither the State nor Federal agencies have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and this Complaint. 33 U.S.C. § 1365(b)(1)(B). No previous administrative penalty issued under CWA Section 309(g) prevents this action from proceeding.

6. The violations occurred within the Eastern District of California. Thus, venue is proper under 33 U.S.C. § 1365(c)(1).

## II. Introduction

7. Plaintiffs seek relief for Defendant's violations of the Permit and CWA occurring at the Facility.

8. Defendant has failed to follow numerous Permit provisions designed to prevent contaminated storm water from discharging into the City of Riverbank Municipal Separate Storm Sewer System ("MS4") and/or Stanislaus River. The MS4 flows into the Stanislaus River, which feeds into the San Joaquin River, the Sacramento Delta, including the Suisan Marsh Wetlands, the San Pablo Bay, the San Francisco Bay, and the Pacific Ocean. These downstream waters are collectively referred to as the Receiving Waters.

9. The Permit failures result in devastating impacts to (1) the flora, fauna, and ecology generally, and (2) the public, including EarthSpotter's and EDEN's members, who use the Receiving Waters to recreate.

10. Pollution from the Facility threatens the overall health of the Receiving Waters and, in turn, the plants and animals that depend on these habitats. When these natural systems are damaged, the public, including EarthSpotter's and EDEN's members, loses valuable recreational, educational, and scientific opportunities. Such contamination can also pose risks to human health. As a result, EarthSpotter's and EDEN's members are less inclined to visit or recreate near waters known to contain harmful metals, high nutrient levels, and other pollutants.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

### III.    **Parties**

11.    Thunderbolt Wood Treating Co., Inc. ("Thunderbolt") is a California corporation that owns and/or operates the Facility.

12.    EarthSpotter is a California non-profit public benefit corporation. EarthSpotter is committed to identifying environmental pollution and reducing its impacts on natural ecosystems—protecting clean water, air, and land, and addressing the effects of climate change on natural resources throughout California. In pursuit of its mission, EarthSpotter works to ensure compliance with environmental statutes, regulations, and other legal protections, including the CWA.  EarthSpotter has active members throughout California.

13.    EDEN is an environmental membership group based in Davis, California. EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California for the benefit of its ecosystems and communities.

14.    EarthSpotter's and EDEN's membership includes individuals who live, work, travel, and engage in recreational activities throughout Stanislaus County.

15.    Plaintiffs' members use and enjoy the Receiving Waters, along with the adjacent riparian, wetland, and beach areas, for recreational and aesthetic purposes, including wildlife observation. They also participate in cleanup, restoration, and conservation efforts within these waters and their surrounding riparian, wetland, and beach environments. They are dedicated to the study, protection, public education, and conservation of the ecosystems, including the species, wildlife, and habitats, that are affected by the quality of the waters into which Defendant's Facility discharges polluted storm water.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

16.    Given the ecological importance and aesthetic and recreational significance of the Receiving Waters, Plaintiffs' members use and enjoy these waters and surrounding ecosystems and wetlands for a wide range of activities. They frequently visit various areas downstream from the Facility for swimming, fishing, hiking, biking, enjoyment of natural open spaces, general aesthetic appreciation, birdwatching, and observation of other fauna, including butterflies, fish, reptiles, and mammals. Plaintiffs' members intend to continue all of the aforementioned activities. As one example of many, less than a mile downstream of the Facility lies Jacob Myers Park, a popular contact recreation location. Image 1[2] below was taken by a member of Plaintiffs' organizations while visiting the park and shows families recreating in the Stanislaus River. The Facility's pollution places these humans at risk.



[2] Google Gemini was used to blur the people. No other alteration was made to the photograph.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

17.    The discharge of storm water with elevated levels of pollutants from the Facility reduces Plaintiffs' members use and enjoyment of the Receiving Waters and the surrounding ecosystems into which they flow. Defendant's discharges diminish their ability to engage in recreational, aesthetic, restoration, conservation, educational, and professional pursuits in these downstream waters and ecosystems. Aware of the pollution concerns discussed herein, Plaintiffs' members avoid or limit activities such as swimming, fishing, kayaking, and other contact or non-contact recreation with the Receiving Waters when they would otherwise choose to participate. The discharge of pollutants, including toxic pollutants, harms aquatic life and riparian species that Plaintiffs and their members observe, consume, and contemplate spiritually, while also degrading the ecosystems and habitats they work to protect and enjoy. Plaintiffs' members have a vested interest in healthy ecosystems and thriving natural flora and fauna populations.

18.    The CWA and Permit violations alleged in this Complaint cause direct injury to the recreational, aesthetic, restoration, conservation, educational, and professional interests of Plaintiffs' members. These injuries are concrete and particularized to Plaintiffs' members.

19.    Plaintiffs' members have an interest in accurate information regarding Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, and educational purposes.

20.    Plaintiffs' members have been deprived of rights to obtain complete and accurate information regarding Defendant's compliance with the Facility's Permit. These informational provisions of the Permit have been instituted by relevant regulatory agencies to protect the Waters of the United States.

21.    As a result of failing to follow Permit provisions designed to protect the Receiving Waters, including accurate and complete information on SMARTS regarding Defendant's Facility operations and accurate and complete Facility

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

monitoring, Plaintiffs' members have suffered informational injuries.

22.    The informational injuries result in Plaintiffs' members being unable to assess the extent of Permit violations at the Facility, the levels and types of pollutants entering the Receiving Waters, and gauge the health and ecosystem ramifications, including to themselves, should they continue to recreate in the affected waterways.

23.    Unless the relief sought in this Complaint is granted, these interests have been, are being, and will continue to be adversely and irreparably harmed by Defendant's failure to comply with the CWA. The injuries to Plaintiffs' members are actual, concrete, and traceable to Defendant's conduct, and redressable by the requested relief.

24.    An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

**IV.    Legal Background**

25.    The CWA prohibits the discharge of polluted storm water associated with industrial activity unless the discharger obtains a National Pollutant Discharge Elimination System ("NPDES") permit and complies with its terms. 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(14).

26.    The CWA requires all storm water dischargers regulated under the CWA to achieve technology-based effluent limitations using the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)-(iii).

27.    The CWA authorizes private citizens to sue to enforce the provisions of the Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1139 (9th Cir.1998).

28.    The CWA allows states to administer its own EPA-approved NPDES permitting program, including storm water NPDES. The EPA has approved

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

California's NPDES permitting program. The State Water Board issues these permits. Cal. Water Code § 13001.

29.    The State Water Board issued a general NPDES permit for industrial manufacturing facilities, which is the Permit as described in Section I, *supra*. Before beginning operations, a facility subject to the Permit that wishes to discharge storm water offsite must apply for coverage by submitting a Notice of Intent ("NOI") to the State Water Board to enroll under the Permit and comply with the Permit's terms.[3] Permit § I.A.17.

30.    Industrial manufacturing facilities with SIC code 2491 (Wood Preserving Establishments) require Permit coverage. Permit, Attachment A.

A.    Effluent Limitations

31.    The Permit requires dischargers to implement BMPs [Best Management Practices] that comply with BAT for toxic and non-conventional pollutants and BCT for conventional pollutants. Permit § V.A.

32.    Toxic pollutants include copper, lead, and zinc, among others. 40 C.F.R. § 401.15.

33.    Conventional pollutants include total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite ("N+N"), iron, phosphorus, and enterococcus, among others. 40 C.F.R. § 401.16.

34.    Dischargers must implement BAT/BCT compliant BMPs to "reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." Permit § V.A.

35.    Failing to develop or implement BMPs that meet BAT and BCT standards violates Permit Section V.A. 33 U.S.C. § 1311(b); 2020 Permit § V.A.

B.    Storm Water Pollution Prevention Plan Requirements

---

[3]A facility may alternatively apply for an individual NPDES permit, though this is rare. In either case, permit coverage and compliance are required.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

36. The Permit requires that dischargers develop and implement a site-specific Storm Water Pollution Prevention Plan Requirements ("SWPPP") and Monitoring Implementation Plan ("MIP") designed to reduce and prevent pollutants from contaminating storm water. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, develop and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and reduce or prevent the discharge of polluted storm water from industrial facilities. Permit § X.C.

37. The SWPPP should outline the necessary BMPs to meet BAT/BCT standards at the facility, based on site-specific conditions and pollutants, and must be revised as necessary to reflect any changes.

38. The SWPPP must include the following non-exhaustive elements:

(1) A narrative description and summary of all industrial activities, potential pollutant sources, and potential pollutants;

(2) A site map showing the storm water conveyance system, discharge points, flow direction, areas of actual or potential pollutant contact, nearby water bodies, and all pollutant control measures, among others;

(3) A description of storm water management practices;

(4) A description of the BMPs that will be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges;

(5) Procedures and BMPs for identifying and eliminating non-storm water discharges;

(6) The locations where materials are shipped, stored, received, or handled, including typical quantities and handling frequency;

(7) A description of dust- and particulate-generating activities;

(8) A list of the individuals responsible for developing and implementing the SWPPP, along with their current roles;

(9) A Monitoring and Implementation Plan ("MIP") that ensures compliance

9

with the Permit including identifying monitoring tasks, discharge locations, visual observation and sampling procedures, justification for alternative discharge locations or sampling reductions if applicable, and an example chain of custody. The MIP also enumerates a team designated to implement the Permit requirements. Permit § X.A-I.

39.    Dischargers must review their SWPPP at least once per year and update it as needed to remain in compliance with the Permit. Any significant revision to the SWPPP must be certified and submitted through Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Permit § X.A-I.

C.    Monitoring and Reporting

40.    The Permit requires the Facility to monitor storm water discharges through (1) monthly visual observations, (2) sampling event observations, and (3) sampling its storm water runoff. Permit § XI.

41.    At least once per month, the Facility must inspect each drainage area for prior, current, or present unauthorized NSWDs, authorized NSWDs, and associated BMPs, and outdoor industrial activities and respective BMPs implementation. While sampling, the discharger shall observe whether the storm water had any floating or suspended materials, oil and grease, turbidity, odors, and potential sources of pollutants.

42.    With respect to storm water sampling, a facility must collect four samples per reporting year: two during the first half of the reporting year (July 1–December 31) and two during the second half (January 1–June 30). If the facility participates in a compliance group, it is required to collect only one sample in each half of the reporting year (two total). All samples must be collected during a Qualified Storm Event ("QSE"). A QSE occurs when a precipitation event produces a "discharge for at least one drainage area; and . . . preceded by 48 hours with no discharge from any drainage area." The sample must be collected within four hours of the start of the discharge or the "start of the facility operations if the QSE occurs within the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

previous 12-hour period." Permit § XI.B.

43.    The Facility must monitor for (1) TSS, (2) oil and grease, (3) pH, (4) any SIC code specific parameters, (5) potential pollutants associated with the facility's industrial sources for which the Receiving Waters have 303(d) impairments or approved TMDLs, and (6) "identified by the [d]ischarger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment," among others. Permit § XI.B.6. All sampling results must be uploaded to SMARTS within thirty days of obtaining said results. Permit § XI.B.11.

44.    The Facility must properly train its employees to implement the Permit including BMP implementation, BMP effectiveness, and observation activities, among others. Permit § X.H.f.

D.    Annual Reporting

45.    Each year, by July 15th, the discharger "shall certify and submit via SMARTS an Annual Report."  The Annual Report shall include: (1) a compliance checklist indicating the facility complied with and "addressed all applicable requirements" of the Permit, (2) an explanation for any non-compliance, (3) any SWPPP amendments within the reporting year, and (4) the date of the Annual Evaluation.  The Annual Evaluation consists of a single comprehensive review of the facility's storm water practices, including an assessment of the prior year's sampling, visual monitoring, and observation records; an inspection of the facility's industrial activities and associated potential pollutants; an examination of drainage areas; an evaluation of any new BMPs and related equipment; and a review of the overall effectiveness of the BMPs. Permit § XVI.

V.    **Facts**

46.    The Facility "performs chemical treatment of wood products to increase resistance to microbial decay and insect damage" under SIC 2491 (Wood Preserving Establishments). SWPPP § 1.2.

11

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

47.    Defendant filed its most recent NOI on May 22, 2022. The Facility was issued Waste Discharge Identification Number ("WDID") 5S50I028660.

48.    The Facility uploaded its most recent SWPPP and Site Map to SMARTS on April 24, 2026.

49.    To effectuate its manufacturing, the Facility cuts, treats, and dries wood; stores raw and industrial materials; stores, uses, and maintains equipment like forklifts; ships and receives goods; and loads and unloads goods.

50.    *The EPA Industrial Stormwater Fact Sheet Series, Sector A: Timber Products Facilities* identifies pollutants associated with wood preserving including TSS, biochemical oxygen demand, chemical oxygen demand, heavy metals, benzene, and acid/alkaline wastes.

51.    Numerous industrial operations and materials at the Facility are located outdoors without sufficient roofing or other protection to keep storm water and non-storm water flows from contacting pollutant sources. In many areas, the Facility also lacks proper secondary containment or other necessary treatment controls to stop contaminated storm water or non-storm water from leaving the site.

52.    Industrial activities occur across the entire site, thus the entire Facility requires coverage under the Permit.  The Permit's definition of "Storm Water Associated With Industrial Activities," and its discussion of material handling, also require coverage for non-industrial area storm water that commingles with industrial storm water. Pollutants generated indoors or beneath partial cover also routinely escape through wind dispersion, vehicle and foot traffic, and other pathways, spreading contamination throughout the Facility grounds. Pollutants from the Facility's industrial activities are, and have been, transported across the site and beyond its boundaries through tracking by vehicles and employees, wind, and storm water movement around the Facility and exiting the property.

53.    On information and belief, Defendant has not submitted to the State Water Quality Control Board a "No Discharge Technical Report" to pursue a No

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Discharge Certification under the Permit's Notice of Non-Applicability provision ("NONA"), as confirmed by public records. Permit § XX.C. Indeed, a No Discharge Certification requires a showing that the Facility is engineered to contain the maximum historic precipitation. *Id*.

54. The Stanislaus River is a water of the United States.

55. On information and belief, the Facility's storm water discharges either offsite into the City of Riverbank Municipal Separate Storm Sewer System and flows north into the Stanislaus River or directly into the Stanislaus River via groundwater.

A. Failure to Implement BMPs

56. Defendant has failed to develop adequate BMPs that comply with BAT/BCT technology.

57. Defendant has failed to implement basic BMPs at its Facility, such as covering industrial materials or storing them under a shelter. On January 30, 2025 and February 6, 2025, the Regional Board inspected the Facility. The Regional Board identified numerous failures to comply with Permit BMPs including evidence of spills and leaks, without proper cleanup, uncontained drums with residue, rusty inutile equipment, rusty, uncovered industrial waste storage, chemical soaked drip pad, uncovered industrial materials like wood, and uncovered poly urea coated equipment, among others. During a rain event, the Facility left uncovered industrial materials like wood, waste storage, and chemical drums. Exhibit 1. The Facility failed to upload any photographs to SMARTS demonstrating corrective actions, as requested by the Regional Board.

58. The Regional Board inspected the Facility in February 2026 and the photographs confirm that Facility continues to fail to implement BMPs. The photographs revealed that the Facility continued to have onsite (1) rusty industrial storage tanks and containers, (2) significant particulate accumulation on impervious surfaces, (3) unmaintained/dense vegetation, (4) evidence of sumps lacking adequate capacity in drainage area #2, (5) industrial equipment stored outdoors

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

without cover, (6) waste barrel not in containment, and (7) used, dirty pallets and poorly tarped industrial materials, among other evidence of poor housekeeping and BMPs.

59.    The Facility implements storm water containment and discharge reduction BMPs, including a detention basin and a bioswale.  However, the Facility's containment systems are not designed or maintained in compliance with Permit Section X.H or to the BAT/BCT standard. There is a lack of evidence that the containment systems consistently retain the volume of runoff produced from an 85th percentile 24-hour storm event, as calculated by a California licensed professional engineer. Thus, the bioswale fails to meet BAT/BCT standards.

60.    Google Earth imagery shows significant material trackout from the Facility's ingress and egress, also demonstrating a lack of adequate BMPs.

B.    Failure to develop and implement an adequate SWPPP

61.    Defendant operates the Facility under a SWPPP that is inadequately developed and implemented.

62.    The Facility's 2020 SWPPP contained the significant deficiencies as outlined in Exhibit 1.

63.    The Facility uploaded a new SWPPP on April 24, 2026. The April 24, 2026 SWPPP has some of the same deficiencies identified in the Notice Letter.

64.    The Facility failed to account for the January 2023 spill from the surface impoundment in its 2026 SWPPP. The Facility's SWPPP must note where onsite there is potential for leaks and spills to occur, including areas with no potential to discharge offsite or within a drainage area that does not discharge offsite. The Facility failed to list the surface impoundment as a potential location. Indeed, the Facility's 2026 SWPPP still fails to comply with numerous components of Permit Section X.G.d including the approximate quantity of the materials spilled, a five year look back period, or preventative measures to prevent reoccurrence.

65.    The Facility's SWPPP still fails to list all industrial materials as required by

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

the Permit. The Facility does identify five treatment chemicals but fails to (1) list what fire retardant chemicals are used and (2) list the approximate quantity of each chemical. Instead, the Facility lumps the five chemicals together on its industrial materials chart. The Facility's SWPPP continues to lack the required associated information, such as where the chemicals are handled.

66.    The 2026 SWPPP fails to identify phosphorus, iron, and chemical oxygen demand as pollutants.

67.    The Facility implements storm water containment and discharge reduction BMPs, including a detention basin and a bioswale.  However, the Facility's containment systems are not designed or maintained in compliance with Permit Section X.H or to the BAT/BCT standard. There is a lack of evidence that the containment systems consistently retain the volume of runoff produced from an 85th percentile 24-hour storm event, as calculated by a California licensed professional engineer.

68.    The Facility's 2026 SWPPP fails to adequately conduct a pollutant source assessment and associated BMPs as the Facility fails to adequately account for pollutant tracking between drainage areas via equipment, employees, materials themselves, and more. The SWPPP appears to treat the Facility as two separate miniature facilities, thus still improperly incorporating and relying on the Title 27 Permit for drainage area #3. This continues to violate numerous provisions of Permit Section X.H.

69.    The Facility uploaded a new Site Map on April 24, 2026. The Facility's April 24, 2026 Site Map fails to comply with Section X.E. as it does not list drainage area #2 sampling location; fails to clearly identify the sampling location in drainage area #1; fails to clearly identify the locations of past spills and leaks; does not accurately depict storm water flow in each drainage area; and fails to identify all industrial storage areas onsite, among other deficiencies.

70.    The Facility has failed to update its SWPPP in accordance with the

15

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

requirements of the Permit. The Permit requires at least an annual analysis of SWPPP adequacy and an obligation to revise the SWPPP on an ongoing basis as needed. Any substantial SWPPP modifications must be submitted to SMARTS within thirty days. Defendant failed to revise its SWPPP between 2020 and 2026.

C.    Failure to Adequately Monitor and Report

71.    Defendant operates the Facility with an inadequate MIP.

72.    Defendant fails to conduct adequate monitoring and reporting at the Facility.

73.    The Facility has failed and continues to fail to collect and analyze its storm water discharges for all parameters required by the Permit. The Facility should at least be testing for iron, phosphorus, and COD in addition to the identified parameters in the SWPPP.

74.    The Facility has failed, and continues to fail, to collect the required four storm water samples each Reporting Year. This failure to obtain the requisite samples constitutes an ongoing and continuous violation of the Permit. Indeed, the Regional Board identified a failure to collect any storm water samples, at the time of inspection, during the 2024-2025 reporting year as a Permit violation. While the Facility did ultimately collect four samples during the 2024-2025 reporting year, all four were collected during the second half of the reporting year. The Facility is required to collect two samples during the first half of the reporting year.

75.    The Facility has failed and continues to fail to identify and sample from all drainage areas and/or discharge locations.

76.    Permit Section X.H.f requires that the Facility train its Pollution Prevention Team to implement the Permit including BMP implementation, BMP effectiveness, visual observations, and monitoring activities. Given the numerous deficiencies discussed in this pleading, the Facility has failed to adequately train its Pollution Prevention Team.

16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

77. The Facility fails to follow the sampling collection procedures outlined in Attachment H. For example, the Facility fails to deliver the samples to the lab within 48 hours of collection.

78. As discussed in Sections IV.A and IV.B *supra*, the Facility has failed to implement BMPs sufficient to prevent the discharge of pollutants. As a result, the Facility has also failed to conduct adequate monitoring as required by the Permit, including performing the required monthly visual observations of BMPs implementation. Indeed, the Regional Board identified a failure to comply with Permit Section X.H.1 for numerous reasons including the storage of rust equipment and material, evidence of leaks and spills, and improper chemical handling and storage.

D.    Failure to Certify Complete and Annual Reports

79.  The Facility has submitted to SMARTS multiple Annual Reports, each accompanied by certifications asserting that the Facility was in full compliance with numerous  Permit provisions.

80. As outlined in this pleading, the Facility has violated—and continues to violate—numerous provisions of the Permit for which the Facility claims compliance, such as adequate monitoring. Thus, these certifications are erroneous. Defendant's Legally Responsible Person and/or Duly Authorized Representative knew or should have known the Facility failed to comply with Permit requirements and that these certifications were false.

81. Specifically, the Facility's Duly Authorized Representative, Alex Flores submitted inaccurate annual reports to SMARTS on August 16, 2024, September 6, 2023, July 13, 2022, and July 30, 2021.

82. The Facility, through Alex Flores, attested in Defendant's 2024 Annual Report that the Facility conducted monthly visual observations in accordance with XI.A.1. As explained in Paragraph 78, this is not true. The 2024 Annual Report also indicates that Defendant did not collect the required number of samples due to lack

17

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

of rain. As discussed in Paragraphs 74 and 75, and Exhibit 1, NOAA Data, on information and belief, this is not true. The Annual Report claims that the Facility conducted its annual evaluation in accordance with Section XVI. As discussed in Paragraph 78, this is not true.

83.    The Facility, through Alex Flores, attested in its 2023 Annual Report that the Facility conducted monthly visual observations in accordance with XI.A.1. As explained in Paragraph 101, this is not true. The Report claims Defendant collected the requisite number of storm water samples. As discussed in Paragraphs 74 and 75, this is not true, as the Facility did not collect storm water samples from each drainage area. The Report also claims that contained storm water has not been discharged from Defendant's facility, which is also untrue. Storm water is pumped to the surface impoundment, and the Facility's surface impoundment leaked in January 2023, thus discharging contained storm water. The Annual Report claims that the Facility conducted its annual evaluation in accordance with Section XVI. As discussed in Paragraph 78, this is not true.

84.    The Facility, through Alex Flores, attested in its 2022 Annual Report that the Facility conducted monthly visual observations in accordance with XI.A.1. As explained in Paragraph 101, this is not true. The Report claims Defendant could not collect the required samples due to insufficient rainfall. As discussed in Paragraphs 74 and 75,  and Exhibit 1, NOAA Data, on information and belief, this is not true. The Annual Report claims that the Facility conducted its annual evaluation in accordance with Section XVI. As discussed in Paragraph 78, this is not true.

85.    The Facility, through Alex Flores, attested in its 2021 Annual Report that the Facility conducted monthly visual observations in accordance with XI.A.1. As explained in Paragraph 101, this is not true. The Report claims it could not collect the required samples due to not enough rainfall. As discussed in Paragraphs 74 and 75,  and Exhibit 1, NOAA Data, on information and belief, this is not true.  The Annual Report claims that the Facility conducted its annual evaluation in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

accordance with Section XVI. As discussed in Paragraph 78, this is not true.

86.    Alex Flores knew or should have known of these inaccurate statements.

87.    The inaccurate and/or misleading Annual Reports continue to be on SMARTS

88.    The Facility's failure to meet the Permit's reporting obligations, along with the submission of false or misleading information, places the Facility in ongoing, daily noncompliance with the Permit.

**VI.    Claims for Relief**

**FIRST CAUSE OF ACTION**

**Failure to implement BMPs that comply with BAT/BCT**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

89.    The foregoing allegations are incorporated herein by reference.

90.    Defendant is a responsible party under the CWA.

91.    Defendant has failed and continues to fail to implement Permit-compliant BMPs designed to reduce or prevent contaminated storm water through use of BAT/BCT, in violation of Permit Section V.A.

92.    Defendant has been in violation of Permit Section V.A since at least February 24, 2021. Defendant's violations are ongoing and continuous.

93.    Each day the Facility operates without developing BAT/BCT compliant BMPs constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

94.    For each violation of Permit Section V.A, the Facility is subject to civil penalties.

**SECOND CAUSE OF ACTION**

**Failure to develop, implement and maintain an adequate SWPPP and MIP**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

95.    The foregoing allegations are incorporated herein by reference.

96.    Defendant has failed and continues to fail to develop an adequate SWPPP in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

violation of Permit Section X.

97. Defendant has failed and continues to fail to implement an adequate SWPPP in violation of Permit Section X.

98. Defendant has failed and continues to fail to revise the SWPPP in violation of Permit Section X.

99. Defendant has failed and continues to fail to develop an adequate MIP in violation of Permit Section X.

100. Defendant has failed and continues to fail to implement an adequate MIP in violation of Permit Section X.

101. Defendant has been in violation of Permit Section X since at least February 24, 2021. Defendant's violations are ongoing and continuous.

102. Each day the Facility operates without developing an adequate SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

103. Each day the Facility operates without implementing an adequate SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

104. Each day the Facility operates without revising the SWPPP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

105. Each day the Facility operates without developing an adequate MIP constitutes separate and distinct violations of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

106. For each violation of Permit Section X, the Facility is subject to civil penalties.

### THIRD CAUSE OF ACTION

**Failure to implement an adequate monitoring and reporting program**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

20

107.   The foregoing allegations are incorporated herein by reference.

108.   Defendant has failed and continues to fail to conduct adequate monthly monitoring in violation of Permit Section XI.

109.   Defendant has failed and continues to fail to collect the required number of storm water samples in violation of Permit Section XI.

110.   Defendant has failed and continues to fail to analyze its storm water samples for all required constituents in violation of Permit Section XI.

111.   Defendant has failed and continues to fail to adequately train its employees in violation of Permit Section XI.

112.   Defendant has failed and continues to fail to adequately train its employees in violation of Permit Section X.H.f.

113.   Defendant has been in violation of Permit Sections XI and X.H.f since at least February 24, 2021. Defendant's violations are ongoing and continuous.

114.   Each failure to adequately monitor and/or train constitutes a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

115.   For each violation of Permit Section X and XI, the Facility is subject to civil penalties.

## FOURTH CAUSE OF ACTION

### Failure to submit accurate annual reports

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

116.   The foregoing allegations are incorporated herein by reference.

117.   Defendant has failed and continues to fail to submit accurate annual reports in violation of Permit Section XVI.

118.   Each day the Facility operates without accurate annual reports is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

119.   Defendant has been in violation of Permit Section XVI since at least

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

February 24, 2021. Defendant's violations are ongoing and continuous.

120. For each violation of Permit Section XVI, the Facility is subject to civil penalties.

## VII.  Relief Request

121. Plaintiffs respectfully request the Court grant the following relief:

(1) A court order declaring Defendant in violation of Sections 301(a) and (b) of the CWA for failure to comply with all Permit provisions.

(2) A court order enjoining Defendant from continuing to violate the CWA and Permit.

(3) A court order requiring Defendant to implement injunctive measures that rectify Defendant's violations of the CWA and Permit.

(4) A court order assessing civil penalties for the aforementioned violations at $68,446 per day per CWA violation that occurred after November 2, 2015, and assessed on or after January 9, 2025.

(5) A court order awarding reasonable fees and costs to Plaintiffs, including attorney fees and witness fees pursuant to Section 505(d) of the CWA.

(6) Any other relief the Court deems appropriate.

/././

/././

/././

/././

/././

/././

/././

/././

/././

/././

/././

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Date: May 4, 2026

Respectfully,

EarthSpotter

By: /s/Natalie Marcin
Natalie Marcin
Attorney for Plaintiff
EarthSpotter
Email: natalie@earthspotter.org


Eden Environmental Defenders

By: /s/Adam Brumm (as authorized on

May 4, 2026)
Adam Brumm
Attorney for Plaintiff Central Valley
Eden Environmental Defenders
Email: adam@edendefenders.org

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

# Exhibit 1

**EarthSp🔍tter**

**EDEN**

*Central Valley Eden Environmental Defenders*

February 13, 2026

VIA PERSONAL SERVICE

| THUNDERBOLT WOOD TREATING CO., INC.<br>ATTN: Managing Agent<br>3400 Patterson Rd<br>Riverbank, California 95367 | Leonard Lovalvo<br>Agent for Service of Process<br>THUNDERBOLT WOOD TREATING CO., INC.<br>3400 Patterson Rd<br>Riverbank, California 95367 |
|---|---|

**Re: Notice of Violations and Intent to File Suit Under the Clean Water Act and Resource Conservation and Recovery Act**

To the Recipient above:

Please accept this letter ("Letter") as notice of THUNDERBOLT WOOD TREATING CO., INC.'s ("Thunderbolt") violations of the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA"). Eden Environmental Defenders ("EDEN") and EarthSpotter intend to file suit for these violations. Thunderbolt has violated, and continues to violate, the CWA and California's General Permit for Storm Water Discharges Associated with Industrial Activities ("Permit").[1] Thunderbolt also discards waste in violation of RCRA. These violations occur at Thunderbolt's industrial manufacturing facility at 3400 Patterson Rd, Riverbank, California 95367 ("Facility").

This Letter notifies you that the Facility is unlawfully discharging polluted storm water into local surface waters, violating the Permit and the CWA. CWA Section 505(b)[2] requires that 60 days notice be given to the alleged violator before a citizen can file a lawsuit. This Letter also notifies you that Thunderbolt discards waste in a manner that threatens human health and the environment. Section 7002(b)(2) of RCRA requires that notice of intent to sue be given 90 days prior to initiation of a civil action under Section 7002(a)(1)(B).

Notice of a CWA citizen suit must also be given to (1) the Administrator of the Environmental Protection Agency ("EPA"), (2) the Regional Administrator of the EPA, (3) the Executive Officer of the State's water pollution control agency where the violations occurred, and (4) if a corporation, the registered agent of the corporation.[3]

---

[1] National Pollutant Discharge Elimination System ("NPDES") Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ & Order WQ 2018-0028-DWQ.
[2] 33 U.S.C. § 1365(a).
[3] 40 C.F.R. § 135.2(a)(1).

*Thunderbolt Wood Treating*

Thunderbolt is the owner and/or operator of the Facility and responsible for implementing CWA requirements and Permit terms at the Facility and its discharges. ███████████ ███████████████████████████████████████████████████ This Letter is issued pursuant to respective citizen suit provisions of RCRA and the CWA and EarthSpotter and EDEN intend to file suits when the applicable notice period expires.

## 1. The Facility

### 1.1 The Facility's Ownership and Operations

The Facility "chemically treats various types wood products so that they are resistant to deterioration due to microbial and insect activity" under SIC 2491 (Wood Preserving Establishments).[4] Manufacturing facilities with this SIC code must submit a Notice of Intent ("NOI") to enroll for coverage under the Permit to the State Water Resources Control Board ("State Water Board"). Thunderbolt filed an NOI on May 22, 2022. The Facility was issued the Waste Discharge Identification Number ("WDID") 5S50I028660. Thunderbolt owns and operates the Facility. As a result, it is responsible under the CWA for all violations arising from the Facility's operations and storm water discharges.

The Permit requires that Thunderbolt develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") and an associated map that describes the layout and Facility's storm water flow ("Site Map").[5] Thunderbolt uploaded its most recent SWPPP and Site Map to the Stormwater Multiple Application and Report Tracking System ("SMARTS") on December 24, 2020.

To effectuate its manufacturing, the Facility cuts, treats, and dries wood, stores raw and industrial materials, stores, uses, and maintains equipment like forklifts, ships and receives goods, and loads and unloads goods.[6]

Industrial activities occur across the entire site, thus the entire Facility requires coverage under the Permit. The Permit's definition of "storm water associated with industrial activities," and its discussion of material handling, also require coverage for non-industrial area storm water that commingles with industrial storm water. Because the Facility lacks Best Management Practices or other controls to keep these flows separate, industrial storm water mixes with non-industrial storm water throughout the site. Accordingly, all storm water discharges from the Facility must be covered by the Permit.

Numerous industrial operations and materials at the Facility are located outdoors without sufficient roofing or other protection to keep storm water and non-storm water flows from

---

[4] SWPPP § 1.1; Facility's NOI.
[5] Permit § X.
[6] SWPPP § 1.1.

*Thunderbolt Wood Treating*

contacting pollutant sources. In many areas, the Facility also lacks proper secondary containment or other necessary treatment controls to stop contaminated storm water or non-storm water from leaving the site.

Pollutants generated indoors or beneath partial cover also routinely escape through wind dispersion, vehicle and foot traffic, and other pathways, spreading contamination throughout the Facility grounds. Pollutants from the Facility's industrial activities are, and have been, transported across the site and beyond its boundaries through tracking by vehicles and employees, wind, and storm water movement around the Facility and exiting the property.

**1.2 The Facility's Storm Water Drainage**

The Facility is twenty-two acres, with 66% of the site consisting of impervious buildings or surfaces. The remaining site consists of gravel industrial areas and vegetated land.

The site is relatively flat, with a two foot berm around the entire property, except the driveway. Per the site map, the site has six drainage areas. Drainage area 1 is in the property's northwest corner and storm water flows into one of the three drop inlets before discharging into the City of Riverbank's Municipal Separate Storm Sewer System ("MS4"). The Facility has numerous sumps around the property that pump water from the remaining drainage basins into either the storm water retention basin in the southwest corner or surface impoundment. The Facility identified one sampling location on the site map, the lift station, before the storm water discharges into the MS4. Industrial activities take place in each drainage area.

The Central Valley Regional Water Quality Control Board ("Regional Board") inspected the Facility during a rain event to determine hydrologic conditions. Drainage area #3 flows from north to south and pools just north of sump #2. Sump #2 discharges near the surface impoundment. From there, gravity carries the storm water to either sumps #3 or #4 which discharge into the surface impoundment. Some of the surface impoundment bound water may also be pumped into above ground storage tanks, stored near the surface impoundment. Within drainage area #2 contains a drop inlet centrally located on the paved surface, which conveys the storm water from this surface to an unlined retention basin in the Facility's southwest region. Water pumped from sump #6 discharges into the vegetation in the Facility's eastern portion and has the potential to gravitate to the retention basin.

During the rain event, in the vegetated and gravel areas in the southeastern corner, storm water infiltrates into the ground and does not act as sheet flow. Significant pooling around the sumps indicate inadequate pumping and/or containment capacity. When the pooling occurs near the staining shed or other industrial processes, the storm water is contaminated with chemicals and other industrial pollutants.

The Regional Board identified three sampling locations in addition lift station spot:  (1) the outfall clean out pipe in drainage area #1, (2) the storm water pipe that conveys water from the northern to southern region of drainage area #2, and (3) the discharge pipe from sump #6. The Regional Board did not clarify whether any storm water discharges out the driveway. The

January 30, 2025 inspection implies that storm water may not discharge out the driveway, but the gradient appears slight and depending on the surrounding conditions, may discharge.

The Facility does not provide calculations regarding flow into the unlined retention basin, or its capacity. Thus, storm water also likely discharges from this basin and would be a fifth sampling location.

Once storm water discharges into the MS4, it continues flowing north into the Stanislaus River, which feeds into San Joaquin River, the Sacramento Delta, including the Suisan Marsh Wetlands, the San Pablo Bay, the San Francisco Bay, and the Pacific Ocean. These downstream waters are collectively referred to as the Receiving Waters.

Unauthorized discharges of contaminated storm water and non-storm water diminish the quality of the Receiving Waters, interfere with EarthSpotter's and EDEN's members' ability to use and enjoy those waters, and create risks to human health, aquatic life, and ecosystem health.

**2. EarthSpotter & EDEN**

EarthSpotter is a California non-profit public benefit corporation. Its mailing address is 3209 Brant Street, San Diego, California 92103, and its telephone number is (619) 320 5270. EarthSpotter is committed to identifying environmental pollution and reducing its impacts on natural ecosystems—protecting clean water, air, and land, and addressing the effects of climate change on natural resources throughout California. In pursuit of its mission, EarthSpotter works to ensure compliance with environmental statutes, regulations, and other legal protections, including the CWA. When warranted, EarthSpotter brings enforcement actions on its own behalf and on behalf of its members.

EDEN is a ███████████████████████████████ in Davis, California. Its mailing address is 1520 E. Covell Blvd, Suite B5, Davis, California 95616 and its phone number is (800) 545 7215. ████████████████████████████████████████████████████

**3. The Facility's Polluted Storm Water Impacts on the Receiving Waters**

During rain storms, enormous volumes of contaminated runoff from industrial sites—including this Facility—flow into storm drains and nearby waterways. Environmental agencies and water-quality experts widely agree that storm water is responsible for more than half of all pollution reaching rivers, streams, and other surface waters annually. Runoff carrying industrial pollutants degrades downstream ecosystems and harms wildlife that rely on clean water.

*Thunderbolt Wood Treating*

The Facility discharges elevated levels of the following pollutants: total suspended solids ("TSS"), total nitrate, copper, and zinc.[7] As discussed in Letter Section 4.4, the Facility also discharges phosphorus, iron, and chemical oxygen demand.

*The EPA Industrial Stormwater Fact Sheet Series, Sector A: Timber Products Facilities* identifies pollutants associated with wood preserving including TSS, biochemical oxygen demand, chemical oxygen demand, heavy metals, benzene, and acid/alkaline wastes.[8]

Contaminated runoff from the Facility diminishes the ecological value of the Receiving Waters, reducing the public's ability, and that of EDEN's and EarthSpotter's members, to use, appreciate, and enjoy these important water resources. The waterways receiving the Facility's storm water are environmentally sensitive and easily affected by pollution.

EarthSpotter's and EDEN's members live, work, recreate, and otherwise make use of the areas surrounding the waters that receive the Facility's discharges, including the Receiving Waters. These members rely on the Receiving Waters for activities such as swimming, boating, kayaking, surfing, birdwatching, wildlife observation, fishing, hiking, biking, walking, running, aesthetic enjoyment, and for educational and interpretive purposes. EarthSpotter and EDEN members also depend on these waters for scientific research, including pollution assessments, habitat monitoring, and restoration efforts.

Pollutant discharges from the Facility impair all of these beneficial uses.

Pollution from the Facility threatens the overall health of the Receiving Waters and, in turn, the plants and animals that depend on these habitats. When these natural systems are damaged, the public, including EDEN's and EarthSpotter's members, loses valuable recreational, educational, and scientific opportunities. Such contamination can also pose risks to human health. As a result, EDEN's and EarthSpotter's members are less inclined to visit or recreate near waters known to contain harmful metals, high nutrient levels, and other pollutants.

The *Water Quality Control Plan for the California Regional Water Quality Control Board Central Valley Region* ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. A Beneficial Use is an identified way that the waterbody can be used such as recreation or water supply. The Lower Stanislaus River (HU 535.30) has the beneficial uses municipal and domestic supply; agricultural irrigation; agricultural stock watering; industry process; industry service supply; industrial power; contact and noncontact recreation; canoeing and rafting; cold and warm freshwater habitat; cold migratory species; warm and cold water spawning; and wildlife habitat. The San Joaquin River downstream of the Stanislaus River has the beneficial

---

[7] Exhibit 1, the Facility's storm water sampling data. The total Nitrate data is compared against the applicable standard for Nitrate+Nitrite ("N+N"), as total Nitrate is a component of N+N.
[8] https://www.epa.gov/sites/default/files/2015-10/documents/sector_a_timber.pdf (last visited January 23, 2026).

*Thunderbolt Wood Treating*

uses municipal and domestic supply; agricultural irrigation; agricultural stock watering; contact and noncontact recreation; canoeing and rafting; cold and warm freshwater habitat; cold and warm migratory species; warm and cold water spawning; and wildlife habitat. The Sacramento San Joaquin Delta has the beneficial uses include municipal and domestic supply; agricultural irrigation; agricultural stock watering; industry process; industry service supply; contact and noncontact recreation; cold and warm freshwater habitat; cold and warm migratory species; warm water spawning; wildlife habitat; and navigation. When the Facility discharges pollutants in excess of standards and objectives designed to protect water quality, the discharges impact or threaten to impact these Beneficial Uses.

If a waterbody cannot meet the water quality standards necessary to support its Beneficial Uses, it is considered impaired. According to the current 303(d) List of Impaired Water Bodies,[9] the Lower Stanislaus River is impaired for group A pesticides, toxicity, temperature, water, and mercury. The San Joaquin River (in Delta Waterways, southern portion) is impaired for water and temperature. The Delta Waterway is impaired for diazinon, furan compounds, group A pesticides, chlorpyrifos, organic enrichment/low dissolved oxygen, dioxin, invasive species, toxicity, PCBs (polychlorinated biphenyls), DDT (dichlorodiphenyltrichloroethane), mercury, temperature, and water. The San Joaquin River from the Delta Waterways to Stockton Ship Channel is impaired for toxicity, imidacloprid, temperature, and water. The Sacramento San Joaquin Delta is impaired for PCBs (polychlorinated biphenyls) (dioxin-like), selenium, PCBs (polychlorinated biphenyls), chlordane, dieldrin, dioxin compounds (including 2,3,7,8-TCDD), invasive species, furan compounds, DDT (dichlorodiphenyltrichloroethane), and mercury. When the Facility discharges the same pollutants as these impairments, the discharges cause or contributes to the Receiving Waters' impairments.

**4. CWA and Permit Violations**

In California, any entity that discharges storm water associated with designated industrial activities must comply with the Permit terms for such discharges to be lawful. As discussed below, the Thunderbolt via the Facility has violated and continues to violate the Permit's ███████████████, Effluent Limitations, ███████████████████, and numerous other requirements designed to protect water quality.

---

[9] 2024 Integrated Report - All Assessed Waters, https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2024-integrated-report.html.

*Thunderbolt Wood Treating*





## 4.2 Effluent Limitations Violations

The Permit requires dischargers to "implement BMPs that comply with the" Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[19] In particular, dischargers must implement these BMPs to "reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability."[20]

The EPA's *NPDES Storm Water Multi-Sector General Permit for Industrial Activities* ("MSGP")'s benchmarks ("EPA Benchmarks") and the Permit's Numeric Action Levels ("NALs") provide numeric benchmarks to evaluate pollutant discharges in storm water.[21] In particular, EPA Benchmarks and NALs indicate "if best management practices are effective and if additional measures are necessary to control pollutants."[22] Exceedances of EPA Benchmarks and NALs indicate that the Facility has not implemented BMPs that comply with BAT and BCT standards.[23]

The Facility's discharges exceed and continue to exceed NALs and EPA Benchmarks for TSS, total nitrate, copper, and zinc. For example, on October 14, 2025, the Facility discharged zinc at concentrations of 0.252 mg/L, over double the EPA Benchmark of 0.12 mg/L. Thus, sampling

---

[18] *See* Exhibit 2, which includes the dates of all precipitation events above .1 inches recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic and Atmospheric Administration at a weather monitoring station(s) geographically nearest to the Facility with precipitation records. EarthSpotter and EDEN will include additional dates of rain events when that information becomes available. Data Codes: DAPR - Number of days included in the multiday precipitation total (MDPR); PRCP - Precipitation; MDPR - Multiday precipitation total (use with DAPR and DWPR, if available).

[19] Permit § V.A.

[20] Permit § V.A.

[21] EPA Benchmarks were developed by the EPA to indicate BAT and BCT technology, an objective, national standard, and thus applicable to the Facility.

[22] Permit, Attachment C at 5; MSGP § 4.2.2.

[23] *See id*.

data indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements in violation of the Permit Effluent Limitation V.A.

Photographs and Regional Board inspections confirm that the Facility fails to implement basic BMPs such as covering industrial materials or storing them under a shelter. On January 30, 2025 and February 6, 2025, the  Regional Board inspected the Facility. The Regional Board identified numerous failures to comply with Permit BMPs including evidence of spills and leaks, without proper cleanup, uncontained drums with residue, rusty inutile equipment, rusty, uncovered industrial waste storage, chemical soaked drip pad, uncovered industrial materials like wood, and uncovered poly urea coated equipment, among others. In a rain event, the Facility left uncovered industrial materials like wood, waste storage, and chemical drums. A subset of photos from the Regional Board inspection are below. The Facility failed to upload any photographs to SMARTS demonstrating corrective actions.

Additionally, Google Earth imagery shows significant material trackout from the Facility's ingress and egress, also demonstrating a lack of adequate BMPs.



*Photograph 1: Displays raw materials, industrial waste, and chemical containers outside, uncovered, during a rain event.*

9
*Thunderbolt Wood Treating*



Photo 17.  Upon closer inspection, there is some leftover stain in the covered gravel portion of the staining area.  Water is pooling by the southwest portion of the paved slab, and adjacent gravel area.

*Photograph 2: Displays "leftover stain" in the staining area during a rain event, evidencing improper spill and leak prevention and cleanup procedures. Caption by the Regional Board.*



Photo 29.  There is a large industrial waste bin full of various metals/materials.  This is completely exposed to storm water.

*Photograph 3: Displays a rusty dumpster and rusty metal waste, uncovered. Caption by the Regional Board.*



Photo 34.  Liquid filled containers are stored outdoors adjacent to the poly urea building and are not in secondary containment.  Residue is observed.

*Photograph 4: Displays chemical barrels with residue not in secondary containment. Caption by the Regional Board.*



*Photograph 5: Displays rusty inutile equipment uncovered.*



*Photograph 6: Google Earth Imagery showing significant trackout, including contaminated storm water, in March 2021.*

Such poor housekeeping, failure to adopt adequate BMPs, and ineffective implementation

of BMPs fail to constitute BAT/BCT and casts doubt on the efficacy of other BMPs identified in the SWPPP. Thus, the Facility has failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of Permit Effluent Limitation V.A.

The Facility violates Permit Effluent Limitation Section V.A. each time that storm water discharges from the Facility where the Facility failed to implement BMPs that meet BAT/BCT standards.[24] Each storm water discharge is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a) that subjects the Facility to civil penalties. Permit Effluent Limitation V.A is an independent requirement, and carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the Permit does not amount to compliance with Effluent Limitation V.A. The Facility owners and/or operators have been in violation since at least February 13, 2021, and EarthSpotter and EDEN will update the dates of violations when additional information and data become available.



*Thunderbolt Wood Treating*



## 4.4 SWPPP and MIP Violations

The Permit requires that dischargers develop and implement a site-specific SWPPP and Monitoring Implementation Plan ("MIP") designed to reduce and prevent pollutants from contaminating storm water. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, develop and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and reduce or prevent the discharge of polluted storm water from industrial facilities.[32] The SWPPP should outline the necessary BMPs to meet BAT/BCT standards at the facility, based on site-specific conditions and pollutants, and must be revised as necessary to reflect any changes.

The SWPPP must include, at minimum, the following elements:

(1) A narrative description and summary of all industrial activities, potential pollutant sources, and potential pollutants;
(2) A site map showing the stormwater conveyance system, discharge points, flow direction, areas of actual or potential pollutant contact, nearby water bodies, and all pollutant control measures;
(3) A description of stormwater management practices;

---

[31] Exhibit 2.
[32] Permit § X.C.

(4) A description of the BMPs that will be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges;

(5) Procedures and BMPs for identifying and eliminating non-stormwater discharges;

(6) The locations where significant materials are shipped, stored, received, or handled, including typical quantities and handling frequency;

(7) A description of dust- and particulate-generating activities;

(8) A list of the individuals responsible for developing and implementing the SWPPP, along with their current roles;

(9) An MIP that identifies team members for monitoring tasks, discharge locations, visual observation and sampling procedures, and justification for alternative discharge locations or sampling reductions, and an example chain of custody.[33]

Dischargers must review their SWPPP at least once per year and update it as needed to remain in compliance with the Permit. Any significant revision to the SWPPP must be certified and submitted through SMARTS within 30 days.[34]

The Facility has failed and continues to fail to develop and implement a sufficient SWPPP and MIP, including an inadequate pollutant source assessment and BMPs section.

In particular, the SWPPP fails to:

(1) list all industrial materials onsite including locations where the material is stored, received, shipped, handled, the typical frequencies and quantities in violation of Permit Section X.F. In particular, the SWPPP lacks completeness. For example, the SWPPP's overview section names the five major chemicals used in the Facility's wood treating.[35] Nonetheless, the SWPPP does not list these chemicals, or any others used, in the industrial materials section.[36] Indeed, the industrial materials table generically states "treatment solutions" and the associated quantities and locations. The Permit requires a comprehensive list of specific industrial materials and requisite information for each material;[37]

(2) provide an adequate associated pollutant assessment for its activities in violation of X.G.2.ii. In particular, the SWPPP fails to identify all potential pollutants onsite based on its industrial processes. For example, the Facility uses Phopho Ammonium Boron, which contains phosphorus, and has rusty equipment and waste, which contains iron.[38] Given the Facility's toxic chemicals onsite, the Facility should also be testing for chemical oxygen demand ("COD"). Nonetheless, the Facility fails to identify phosphorus, COD, and iron as associated pollutants and include the parameters in the MIP;

---

[33] Permit § X.A-I.

[34] Permit § X.A-I.

[35] SWPPP at § 1.1.

[36] SWPPP at Table 2. Table 3 does provide slightly more specific information regarding chemical amounts, but not enough to comply with Permit Section X.F.

[37] Permit § X.F.

[38] SWPPP at § 1.1.

*Thunderbolt Wood Treating*

(3) provide site-specific BMPs and the associated narrative in violation of Permit Section X.H.4. For each BMP, the Facility must identify the pollutant that BMP is designed to reduce, the frequency or conditions when implemented, location, person responsible, equipment and tools necessary for the BMP, and procedures and instructions for the BMP. In particular, the SWPPP lacks completeness as to these requirements. For example, the Facility fails to identify any necessary tool to implement the BMPs;[39]

(4) identify all discharge locations that require sampling in violation of Permit Section I.2. The Regional Board identified three additional sampling locations. Nonetheless, the SWPPP and Site Map remains unchanged and the Facility failed to sample at each of the identified locations during its subsequent sampling dates;

(5) identify on the site map all required parameters such as waste storage, equipment maintenance, the location of all storm water collection and conveyance systems, and the discharge locations in violation of Permit Section X.E. Indeed, the Regional Board identified the Site Map as inadequate in the February 21, 2025 letter and the Facility has failed to upload to SMARTS a new map;

(6) include the required information for leaks and spills in violation of Permit Section X.G.d. The January 2025 Regional Board inspection noted several Facility areas with evidence of past leaks and spills;

(7) accurately analyze the Receiving Water impairments in violation of Permit Section X.G.2.ix. As discussed in Letter Section 4.3, the Facility does discharge pollutants that impact Receiving Water impairments.

Notably, the SWPPP incorporates documents produced to comply with the Facility's Order Number R5-2010-0125, *Waste Discharge Requirements for Thunderbolt Wood Treating Company, Inc. Lovalvo Leaonard & Grace Trust, Lovalvo Family 2005 Trust Class II Surface Impoundment Stanislaus County* (Title 27 WDR").[40] This is improper. The Title 27 WDR regulates discharges to the surface impoundment versus the Permit regulates storm water discharges off property. As employees, trucks, and other influences track materials and pollutants throughout the Facility, all Facility areas except the surface impoundment itself must contain Permit-compliant BMPs. Thus, any overlapping BMPs between the Permit and the Title 27 WDR, must be included in the SWPPP with the requisite information such as frequency and tools necessary to execute the BMP.

The Facility has failed to update its SWPPP in accordance with the requirements of the Permit. The Permit requires at least and annual analysis of SWPPP adequacy and an obligation to revise the SWPPP on an ongoing basis as needed. Any substantial SWPPP modification must be kept onsite and submitted to SMARTS within thirty days. However, despite the Facility's elevated pollutant levels in storm water discharges and being notified by the Regional Board of numerous Permit violations, the SWPPP has remained unchanged since 2020. Indeed, the

---

[39] *See generally* SWPPP § 8.
[40] *See generally* SWPPP § 8.

Regional Board identified the need to upload a new SWPPP by March 21, 2025 and the Facility has yet to comply.[41]

Each day that the Facility operates without adequately developing, implementing, and revising the Facility's SWPPP is a separate and distinct violation of the Permit and CWA. Each day that the Facility operates without adequately developing, implementing, and revising the Facility's MIP is a separate and distinct violation of the Permit and CWA. The Facility has operated and continues to operate without complying with the Permit's SWPPP and MIP requirements since at least February 13, 2021. The Facility is subject to civil penalties for all violations since that time. These violations are ongoing and EarthSpotter and EDEN will include additional violations when information becomes available.

**4.5 Monitoring Violations**

The Permit requires the Facility to monitor storm water discharges through (1) monthly visual observations, (2) sampling event observations, and (3) sampling its storm water runoff.[42] At least once per month, the Facility must inspect each drainage area for prior, current, or present unauthorized NSWDs, authorized NSWDs, and associated BMPs, and outdoor industrial activities and respective BMPs implementation. While sampling, the discharger shall observe whether the storm water had any floating or suspended materials, oil and grease, turbidity, odors, and potential sources of pollutants.

With respect to storm water sampling, a facility must collect four samples per reporting year: two during the first half of the reporting year (July 1–December 31) and two during the second half (January 1–June 30). If the facility participates in a compliance group, it is required to collect only one sample in each half of the reporting year (two total). All samples must be collected during a Qualified Storm Event ("QSE").[43] A QSE occurs when a precipitation event produces a "discharge for at least one drainage area; and . . . preceded by 48 hours with no discharge from any drainage area."[44] The sample must be collected within four hours of the start of the discharge or the "start of the facility operations if the QSE occurs within the previous 12-hour period."[45] The facility must monitor for (1) TSS, (2) oil and grease, (3) pH, (4) any SIC code specific parameters, (5) potential pollutants associated with the facility's industrial sources for which the Receiving Waters have 303(d) impairments or approved TMDLs, and (6) "identified by the [d]ischarger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment," among others.[46]

The Facility has failed and continues to fail to collect and analyze its storm water discharges for the all parameters required by the Permit. As discussed in Section 4.4, the Facility should at

---

[41] Regional Board February 21, 2025 letter.
[42] Permit § XI.
[43] Permit § XI.B.
[44] Permit § XI.B.1.
[45] Permit § XI.B.5.
[46] Permit § XI.B.6.

*Thunderbolt Wood Treating*

least be testing for iron, phosphorus, and COD in addition to the identified parameters in the SWPPP.

The Facility has failed, and continues to fail, to collect the required four storm water samples each Reporting Year (see Table 1 below). This failure to obtain the requisite samples constitutes an ongoing and continuous violation of the Permit. Indeed, the Regional Board identified a failure to collect any storm water samples during the 2024-2025 reporting year as a Permit violation.[47] While the Facility did collect four samples during the 2024-2025 reporting year, all four were collected during the second half of the reporting year. The Facility is required to collect two samples during the first half of the reporting year.

| Reporting Year | Number of Dates Collected | Number Required |
|---|---|---|
| 2020-2021 | 1 | 4 |
| 2021-2022 | 2 | 4 |
| 2022-2023 | 4 | 4 |
| 2023-2024 | 1 | 4 |
| 2024-2025 | 4[48] | 4 |

*Table 1: Displays the number of samples collected by the Facility and the number required, per reporting year.*

As discussed in Section 1.2, the Facility has at least four sampling locations, potentially six. The Facility has failed and continues to fail to identify and sample from all locations.

The Facility fails to follow the sampling collection procedures outlined in Attachment H. For example, the Facility fails to deliver the samples to the lab within 48 hours of collection.[49]

Permit Section X.H.f requires that the Facility train its Pollution Prevention Team to implement the Permit including BMP implementation, BMP effectiveness, visual observations, and monitoring activities. Given the numerous deficiencies discussed in Section 4, the Facility has failed to adequately train its Pollution Prevention Team.

As discussed in Sections 4.2 *supra*, the Facility has failed to implement BMPs sufficient to prevent the discharge of pollutants. As a result, the Facility has also failed to conduct adequate monitoring as required by the Permit, including performing the required monthly visual observations of BMPs implementation. Indeed, the Regional Board identified a failure to comply with Permit Section X.H.1 for numerous reasons including the storage of rust equipment and material, evidence of leaks and spills, and improper chemical handling and storage.

---

[47] Regional Board February 21, 2025 letter.
[48] The Facility collected all four samples in the second half of the reporting year.
[49] *E.g.* March 5, 2025 sampling event lab report.

Each failure to conduct monitoring in accordance with the Permit constitutes a separate and distinct violation of the CWA and the Permit. The Thunderbolt Facility has operated, and continues to operate, without adequate monitoring since at least February 13, 2021, and is subject to civil penalties for all such violations occurring from that date forward. These violations are ongoing, and EarthSpotter and EDEN will identify and include additional violations as further information becomes available.

## 4.6 Annual Reporting Violations

Each year, by July 15th, the discharger "shall certify and submit via SMARTS an Annual Report."[50] The Annual Report shall include: (1) a compliance checklist indicating the facility complied with and "addressed all applicable requirements" of the Permit, (2) an explanation for any non-compliance, (3) any SWPPP amendments within the reporting year, and (4) the date of the Annual Evaluation.[51] The Annual Evaluation consists of a single comprehensive review of the facility's storm water practices, including an assessment of the prior year's sampling, visual monitoring, and observation records; an inspection of the facility's industrial activities and associated potential pollutants; an examination of drainage areas; an evaluation of any new BMPs and related equipment; and a review of the overall effectiveness of the BMPs.[52]

The Annual Report must be signed by the Facility's Legally Responsible Person or their Duly Authorized Representative.[53] CWA "[S]ection 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both."[54]

The Facility has submitted multiple Annual Reports, each accompanied by certifications asserting that the Facility was in full compliance with the Permit. However, as outlined in Section 4 of this Letter, the Facility has violated—and continues to violate—numerous provisions of the Permit. Thus, these certifications are erroneous and the Facility's Legally Responsible Person should have known the Facility failed to comply with Permit requirements and these certifications were false.

The Facility's failure to meet the Permit's reporting obligations, along with the submission of false or misleading information, places the Facility in ongoing, daily noncompliance with the Permit. Each day that the Facility continues operations without submitting the required reporting constitutes a separate and distinct violation of the Permit and CWA. The Facility has been in continuous daily violation of the Permit's reporting requirements since at least February 13,

---

[50] Permit § XVI.A.
[51] Permit § XVI.B.
[52] Permit § XV.
[53] Permit § XXI.K.
[54] Permit § XXI.N.

2021. These violations continue, and EarthSpotter and EDEN will identify additional violations as new information becomes available.







## 7. Conclusion

EarthSpotter and EDEN remain open to discussing appropriate measures to address the violations outlined in this Letter. Nevertheless, once the applicable notice period concludes, EarthSpotter and EDEN intend to initiate a citizen enforcement action under Section 505(a) of the CWA based on the Facility's violations of the Permit and under Section 7002(a)(1)(B) for RCRA violations.

If you wish to engage in settlement discussions, please contact counsel for EarthSpotter and EDEN:

| EarthSpotter | EDEN |
|---|---|
| Natalie Marcin<br>General Counsel<br>EarthSpotter<br>3209 Brant Street<br>San Diego, CA 92103<br>(301) 751 7554 | Adam D. Brumm, Esq.<br>responses@edendefenders.org<br>Central Valley Eden Environmental Defenders, LLC<br>1520 E. Covell Blvd, Suite B5<br>Davis, CA 95616<br>(800) 545-7215, extension 906 |

---

66 ██████████████

Sincerely,

Natalie Marcin
Attorney for EarthSpotter

*EDEN Environmental Defenders*

Service List

*Via U.S. Mail*

| | |
|---|---|
| Patrick Pulupa<br>Executive Officer<br>Central Valley Regional Water Quality Control Board<br>11020 Sun Center Drive, #200<br>Rancho Cordova, California 95670 | Lee Zeldin, Administrator<br>Environmental Protection Agency<br>Office of the Administrator 1101A<br>1200 Pennsylvania Ave N.W.<br>Washington, DC 20460 |
| Mike Martucci<br>Acting Regional Administrator<br>U.S. Environmental Protection Agency<br>Region IX<br>75 Hawthorne Street<br>San Francisco, California 94105 | Eric Oppenheimer<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, California 95812 |
| | Katherine Butler<br>Director<br>Department of Toxic Substances Control<br>P.O. Box 806<br>Sacramento, California, 95812 |

24
*Thunderbolt Wood Treating*

| Date | Parameter | Sampling Point | Units | Result | CTR | Annual NAL | EPA Benchmark |
|---|---|---|---|---|---|---|---|
| 3/17/2025 | Copper | 1 | mg/L | 0.0541 | 0.013 | 0.0332 | 0.0059 |
| 3/17/2025 | Copper | Clean Out | mg/L | 0.044 | 0.013 | 0.0332 | 0.0059 |
| 3/17/2025 | Total Nitrate | 1 | mg/L | 3.4 | | 0.68 | 0.68 |
| 3/17/2025 | Total Nitrate | Clean Out | mg/L | 3.9 | | 0.68 | 0.68 |
| 3/14/2025 | TSS | 1 | mg/L | 117 | | 100 | 100 |
| 3/14/2025 | TSS | Clean Out | mg/L | 199 | | 100 | 100 |
| 3/5/2025 | Copper | 1 | mg/L | 0.127 | 0.013 | 0.0332 | 0.0059 |
| 3/5/2025 | Copper | Clean Out | mg/L | 0.0877 | 0.013 | 0.0332 | 0.0059 |
| 3/5/2025 | Copper | 1 | mg/L | 0.0452 | 0.013 | 0.0332 | 0.0059 |
| 3/5/2025 | Copper | Clean Out | mg/L | 0.0638 | 0.013 | 0.0332 | 0.0059 |
| 3/5/2025 | Total Nitrate | 1 | mg/L | 3.52 | | 0.68 | 0.68 |
| 3/5/2025 | Total Nitrate | Clean Out | mg/L | 2.64 | | 0.68 | 0.68 |
| 3/5/2025 | TSS | 1 | mg/L | 572 | | 100 | 100 |
| 3/5/2025 | TSS | Clean Out | mg/L | 218 | | 100 | 100 |
| 3/5/2025 | Zinc | 1 | mg/L | 0.252 | 0.12 | 0.262 | 0.12 |
| 3/5/2025 | Zinc | Clean Out | mg/L | 0.147 | 0.12 | 0.262 | 0.12 |
| 03/05/2025 | Copper | Retention Basin | mg/L | 0.0238 | 0.013 | 0.0332 | 0.0059 |
| 2/13/2025 | Copper | 1 | mg/L | 0.0229 | 0.013 | 0.0332 | 0.0059 |
| 1/22/2024 | Copper | 1 | mg/L | 0.103 | 0.013 | 0.0332 | 0.0059 |
| 1/22/2024 | Total Nitrate | 1 | mg/L | 0.81 | | 0.68 | 0.68 |
| 3/4/2023 | Copper | 1 | mg/L | 0.136 | 0.013 | 0.0332 | 0.0059 |
| 3/4/2023 | Total Nitrate | 1 | mg/L | 1.93 | | 0.68 | 0.68 |
| 1/15/2023 | Copper | 1 | mg/L | 0.117 | 0.013 | 0.0332 | 0.0059 |
| 12/27/2022 | Total Nitrate | 1 | mg/L | 2.11 | | 0.68 | 0.68 |
| 12/10/2022 | Copper | 1 | mg/L | 0.0225 | 0.013 | 0.0332 | 0.0059 |
| 12/10/2022 | Total Nitrate | 1 | mg/L | 1.65 | | 0.68 | 0.68 |
| 12/14/2021 | Copper | 1 | mg/L | 0.078 | 0.013 | 0.0332 | 0.0059 |
| 12/14/2021 | Total Nitrate | 1 | mg/L | 1.99 | | 0.68 | 0.68 |
| 12/14/2021 | TSS | 1 | mg/L | 287 | | 100 | 100 |
| 12/14/2021 | Zinc | 1 | mg/L | 0.212 | 0.12 | 0.262 | 0.12 |
| 10/25/2021 | Copper | 1 | mg/L | 0.0452 | 0.013 | 0.0332 | 0.0059 |

Exhibit 1: Sampling Data

| Date | Parameter | Sampling Point | Units | Result | CTR | Annual NAL | EPA Benchmark |
|---|---|---|---|---|---|---|---|
| 10/25/2021 | TSS | 1 | mg/L | 142 |  | 100 | 100 |
| 10/25/2021 | Zinc | 1 | mg/L | 0.146 | 0.12 | 0.262 | 0.12 |
| 2/2/2021 | Copper | 1 | mg/L | 0.0523 | 0.013 | 0.0332 | 0.0059 |
| 2/2/2021 | Total Nitrate | 1 | mg/L | 2.04 |  | 0.68 | 0.68 |
| 2/2/2021 | TSS | 1 | mg/L | 170 |  | 100 | 100 |
| 2/2/2021 | Zinc | 1 | mg/L | 0.139 | 0.12 | 0.262 | 0.12 |

Exhibit 1: Sampling Data

| STATION | NAME | DATE | PRCP |
|---------|------|------|------|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-05 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-04 | 0.28 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-03 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-01 | 0.75 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-12-26 | 0.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-12-25 | 0.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-12-24 | 0.66 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-18 | 0.88 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-17 | 0.55 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-16 | 1.52 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-14 | 0.58 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-13 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-10-15 | 0.84 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-10-14 | 1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-09-25 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-04-26 | 0.38 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-04-02 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-18 | 0.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-17 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-15 | 0.51 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-14 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-13 | 1.01 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-06 | 0.37 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-05 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-03 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-14 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-13 | 0.99 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-07 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-05 | 0.64 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-04 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-01 | 0.2 |

Exhibit 2: Precipitation Data

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-01-04 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-30 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-27 | 0.74 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-25 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-24 | 0.21 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-23 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-22 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-17 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-15 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-14 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-12 | 0.47 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-26 | 0.14 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-25 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-23 | 0.53 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-12 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-05-05 | 0.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-04-14 | 1.02 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-04-05 | 0.78 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-04-01 | 0.28 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-30 | 0.7 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-24 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-23 | 0.34 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-04 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-03 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-02 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-21 | 0.23 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-19 | 0.71 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-18 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-15 | 0.61 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-08 | 0.63 |

Exhibit 2: Precipitation Data

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-06 | 0.14 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-05 | 0.98 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-04 | 0.36 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-03 | 0.14 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-02 | 0.27 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-01 | 1.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-25 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-24 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-23 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-22 | 1.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-21 | 0.34 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-20 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-17 | 0.52 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-14 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-11 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-07 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-03 | 0.55 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-30 | 0.81 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-28 | 0.31 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-21 | 0.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-20 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-19 | 0.21 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-18 | 0.33 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-11-19 | 0.52 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-11-18 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-10-23 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-05-03 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-30 | 0.23 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-29 | 0.58 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-23 | 0.34 |

Exhibit 2: Precipitation Data

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-22 | 0.39 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-21 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-20 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-15 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-14 | 0.28 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-13 | 0.53 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-12 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-11 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-10 | 0.96 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-06 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-05 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-01 | 0.41 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-28 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-27 | 0.61 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-25 | 0.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-24 | 0.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-06 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-05 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-30 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-19 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-16 | 1.69 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-15 | 0.53 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-14 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-12 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-11 | 0.36 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-10 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-09 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-08 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-06 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-05 | 0.35 |

Exhibit 2: Precipitation Data

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-03 | 0.43 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-01 | 1.67 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-31 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-30 | 0.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-29 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-28 | 0.78 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-27 | 1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-12 | 0.26 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-11 | 1.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-04 | 0.78 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-02 | 0.68 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-11-09 | 0.32 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-11-08 | 0.31 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-11-07 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-04-22 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-04-21 | 0.18 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-03-28 | 0.48 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-29 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-28 | 0.38 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-27 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-26 | 0.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-24 | 1.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-22 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-16 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-14 | 1.63 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-13 | 0.64 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-09 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-07 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-11-09 | 0.21 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-26 | 0.22 |

Exhibit 2: Precipitation Data

| STATION | NAME | DATE | PRCP |
| --- | --- | --- | --- |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-25 | 3.03 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-24 | 0.18 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-23 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-22 | 0.48 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-19 | 0.23 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-16 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-15 | 0.18 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-10 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-02-12 | 0.4 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-02-03 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-29 | 1.31 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-28 | 1.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-27 | 0.99 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-25 | 0.15 |