# Exhibit 2



EDEN

*Central Valley* Eden Environmental Defenders

May 4, 2026

VIA PERSONAL SERVICE AND CERTIFIED MAIL RETURN RECEIPT REQUESTED

THUNDERBOLT WOOD TREATING CO., INC.
ATTN: Managing Agent
3400 Patterson Rd
Riverbank, California 95367

**Re: Notice of Violations and Intent to File Suit Under the Clean Water Act and Resource Conservation and Recovery Act**

To the Recipient above:

Please accept this letter ("Letter") as notice of THUNDERBOLT WOOD TREATING CO., INC.'s ("Thunderbolt") violations of the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA"). Eden Environmental Defenders ("EDEN") and EarthSpotter intend to file suit for these violations. Thunderbolt has violated, and continues to violate, the CWA and California's General Permit for Storm Water Discharges Associated with Industrial Activities ("Permit").[1] ████████████████████████████. These violations occur at Thunderbolt's industrial manufacturing facility at 3400 Patterson Rd, Riverbank, California 95367 ("Facility").

This Letter notifies you that the Facility is unlawfully discharging polluted storm water into local surface waters, violating the Permit and the CWA. CWA Section 505(b)[2] requires that 60 days' notice be given to the alleged violator before a citizen can file a lawsuit. ████████████████████████████████████████████████████████████████████████████████████████████████

Notice of a CWA citizen suit must also be given to (1) the Administrator of the Environmental Protection Agency ("EPA"), (2) the Regional Administrator of the EPA, (3) the Executive Officer of the State's water pollution control agency where the violations occurred, and (4) if a corporation, the registered agent of the corporation.[3] Notice of a RCRA citizen suit under Section 7002(b) must also be given to the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the State.

---

[1] National Pollutant Discharge Elimination System ("NPDES") Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ & Order WQ 2018-0028-DWQ.
[2] 33 U.S.C. § 1365(a).
[3] 40 C.F.R. § 135.2(a)(1).

*Thunderbolt Wood Treating*

Thunderbolt is the owner and/or operator of the Facility and responsible for implementing CWA requirements and Permit terms at the Facility. ███████████████████████████████ ███████████████████████████████████████████████████████ This Letter is issued pursuant to respective citizen suit provisions of ██████████ the CWA and EarthSpotter and EDEN intend to file suits when the applicable notice period expires.

## 1. The Facility

### 1.1 The Facility's Ownership and Operations

The Facility "performs chemical treatment of wood products to increase resistance to microbial decay and insect damage" under SIC 2491 (Wood Preserving Establishments).[4] Manufacturing facilities with this SIC code must submit a Notice of Intent ("NOI") to enroll for coverage under the Permit to the State Water Resources Control Board ("State Water Board"). Thunderbolt filed an NOI on May 42, 2022. The Facility was issued the Waste Discharge Identification Number ("WDID") 5S50I028660. Thunderbolt owns and operates the Facility. As a result, it is responsible under the CWA for all violations arising from the Facility's operations and storm water discharges.

The Permit requires that Thunderbolt develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") and an associated map that describes the layout and Facility's storm water flow ("Site Map").[5] Thunderbolt uploaded its most recent SWPPP and Site Map to the Stormwater Multiple Application and Report Tracking System ("SMARTS") on April 24, 2026.

To effectuate its manufacturing, the Facility cuts, treats and dries wood; stores raw and industrial materials; stores, uses, and maintains equipment like forklifts; ships and receives goods; and loads and unloads goods.

Industrial activities occur across the entire site; thus, the entire Facility requires coverage under the Permit.[6] The Permit's definition of "Storm Water Associated With Industrial Activities," and its discussion of material handling, also require coverage for non-industrial area storm water that commingles with industrial storm water. Pollutants generated indoors or beneath partial cover also routinely escape through wind dispersion, vehicle and foot traffic, and other pathways, spreading contamination throughout the Facility grounds. Pollutants from the Facility's industrial activities are, and have been, transported across the site and beyond its boundaries through tracking by vehicles and employees, wind, and storm water movement around the Facility and exiting the property.

---

[4] SWPPP § 1.2.
[5] Permit § X.
[6] See Section 4.2 *infra* for more information.

Numerous industrial operations and materials at the Facility are located outdoors without sufficient roofing or other protection to keep storm water and non-storm water flows from contacting pollutant sources. In many areas, the Facility also lacks proper secondary containment or other necessary treatment controls to stop contaminated storm water or non-storm water from leaving the site.

**1.2 The Facility's Storm Water Drainage**

The Facility is twenty-two acres, with 66% of the site consisting of impervious buildings or surfaces. The remaining site consists of gravel industrial areas and vegetated land. The Facility has a driveway with a slight gradient, where the entire property slopes towards the Stanislaus River. Thus, the storm water discharges out the driveway in significant rain events.

Thunderbolt has not submitted to the Water Board a "No Discharge Technical Report" to pursue a No Discharge Certification under the Permit's Notice of Non-Applicability provision ("NONA"), as confirmed by public records. Thus, the Facility has subjected itself to the Permit.

The Facility's storm water discharges either offsite into the City of Riverbank Municipal Separate Storm Sewer System and flows north into the Stanislaus River or directly into the Stanislaus River via groundwater. The Stanislaus River feeds into San Joaquin River, the Sacramento Delta, including the Suisan Marsh Wetlands, the San Pablo Bay, the San Francisco Bay, and the Pacific Ocean. These downstream waters are collectively referred to as the Receiving Waters.

**2. EarthSpotter & EDEN**

EarthSpotter is a California non-profit public benefit corporation. Its mailing address is 2801 B Street, Unit 2006, San Diego, California 92102,[7] and its telephone number is (619) 320 5270. EarthSpotter is committed to identifying environmental pollution and reducing its impacts on natural ecosystems—protecting clean water, air, and land, and addressing the effects of climate change on natural resources throughout California. In pursuit of its mission, EarthSpotter works to ensure compliance with environmental statutes, regulations, and other legal protections, including the CWA. When warranted, EarthSpotter brings enforcement actions on its own behalf and on behalf of its members.

EDEN is an environmental membership group based in Davis, California. Its mailing address is 1520 E. Covell Blvd, Suite B5, Davis, California 95616 and its phone number is (800) 545-7215. EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California for the benefit of its ecosystems and communities.

---

[7] EarthSpotter updated its mailing address since the February 2026 Notice Letter.

**3. The Facility's Polluted Storm Water Impacts on the Receiving Waters**

During rain storms, enormous volumes of contaminated runoff from industrial sites—including this Facility—flow into storm drains and nearby waterways. Environmental agencies and water-quality experts widely agree that storm water is responsible for more than half of all pollution reaching rivers, streams, and other surface waters annually. Runoff carrying industrial pollutants degrades downstream ecosystems and harms wildlife that rely on clean water.

*The EPA Industrial Stormwater Fact Sheet Series, Sector A: Timber Products Facilities* identifies pollutants associated with wood preserving including TSS, biochemical oxygen demand, chemical oxygen demand, heavy metals, benzene, and acid/alkaline wastes.[8]

Contaminated runoff from the Facility diminishes the ecological value of the Receiving Waters, reducing the public's ability, and that of EDEN's and EarthSpotter's members, to use, appreciate, and enjoy these important water resources. The waterways receiving the Facility's storm water are environmentally sensitive and easily affected by pollution.

EarthSpotter's and EDEN's members live, work, recreate, and otherwise make use of the areas surrounding the waters that receive the Facility's discharges, including the Receiving Waters. These members rely on the Receiving Waters for activities such as swimming, boating, kayaking, surfing, birdwatching, wildlife observation, fishing, hiking, biking, walking, running, aesthetic enjoyment, and for educational and interpretive purposes. EarthSpotter and EDEN members also depend on these waters for scientific research, including pollution assessments, habitat monitoring, and restoration efforts.

Pollution from the Facility threatens the overall health of the Receiving Waters and, in turn, the plants and animals that depend on these habitats. When these natural systems are damaged, the public, including EDEN's and EarthSpotter's members, lose valuable recreational, educational, and scientific opportunities. Such contamination can also pose risks to human health. As a result, EDEN's and EarthSpotter's members are less inclined to visit or recreate near waters known to contain harmful metals, high nutrient levels, and other pollutants.

The *Water Quality Control Plan for the California Regional Water Quality Control Board Central Valley Region* ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. A Beneficial Use is an identified way that the waterbody can be used such as recreation or water supply. The Lower Stanislaus River (HU 535.30) has the beneficial uses municipal and domestic supply; agricultural irrigation; agricultural stock watering; industry process; industry service supply; industrial power; contact and noncontact recreation; canoeing and rafting; cold and warm freshwater habitat; cold migratory species; warm and cold water spawning; and wildlife habitat. The San Joaquin River downstream of the Stanislaus River has the beneficial uses municipal and domestic supply; agricultural irrigation; agricultural stock watering; contact and noncontact recreation; canoeing and rafting; cold and warm freshwater habitat; cold and

---

[8] https://www.epa.gov/sites/default/files/2015-10/documents/sector_a_timber.pdf (last visited January 23, 2026).

warm migratory species; warm and cold water spawning; and wildlife habitat. The Sacramento San Joaquin Delta has the beneficial uses include municipal and domestic supply; agricultural irrigation; agricultural stock watering; industry process; industry service supply; contact and noncontact recreation; cold and warm freshwater habitat; cold and warm migratory species; warm water spawning; wildlife habitat; and navigation. When the Facility discharges pollutants in excess of standards and objectives designed to protect water quality, the discharges impact or threaten to impact these Beneficial Uses.

If a waterbody cannot meet the water quality standards necessary to support its Beneficial Uses, it is considered impaired. According to the current 303(d) List of Impaired Water Bodies,[9] the Lower Stanislaus River is impaired for group A pesticides, toxicity, temperature, water, and mercury. The San Joaquin River (in Delta Waterways, southern portion) is impaired for water and temperature. The Delta Waterway is impaired for diazinon, furan compounds, group A pesticides, chlorpyrifos, organic enrichment/low dissolved oxygen, dioxin, invasive species, toxicity, PCBs (polychlorinated biphenyls), DDT (dichlorodiphenyltrichloroethane), mercury, temperature, and water. The San Joaquin River from the Delta Waterways to Stockton Ship Channel is impaired for toxicity, imidacloprid, temperature, and water. The Sacramento San Joaquin Delta is impaired for PCBs (polychlorinated biphenyls) (dioxin-like), selenium, PCBs (polychlorinated biphenyls), chlordane, dieldrin, dioxin compounds (including 2,3,7,8-TCDD), invasive species, furan compounds, DDT (dichlorodiphenyltrichloroethane), and mercury. When the Facility discharges the same pollutants as these impairments, the discharges cause or contributes to the Receiving Waters' impairments.

## 4. CWA and Permit Violations

In California, any entity that discharges storm water associated with designated industrial activities must comply with the Permit terms for such discharges to be lawful. As discussed below, the Thunderbolt via the Facility has violated and continues to violate numerous Permit requirements designed to protect water quality.

## 4.1 Effluent Limitations Violations

The Permit requires dischargers to "implement BMPs that comply with the" Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[10] In particular, dischargers must implement these BMPs to "reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability."[11]

---

[9] 2024 Integrated Report - All Assessed Waters, https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2024-integrated-report.html.

[10] Permit § V.A.

[11] Permit § V.A.

*Thunderbolt Wood Treating*

Photographs and Regional Board inspections confirm that the Facility fails to implement basic BMPs such as covering industrial materials or storing them under a shelter. On January 30, 2025 and February 6, 2025, the Regional Board inspected the Facility. The Regional Board identified numerous failures to comply with Permit BMPs and/or BAT/BCT including evidence of spills and leaks, without proper cleanup, uncontained drums with residue, rusty inutile equipment, rusty, uncovered industrial waste storage, chemical soaked drip pad, uncovered industrial materials like wood, and uncovered poly urea coated equipment, among others. In a rain event, the Facility left uncovered industrial materials like wood, waste storage, and chemical drums. A subset of photos from the Regional Board inspection are below. The Facility failed to upload any photographs to SMARTS demonstrating corrective actions.

Google Earth imagery also shows significant material trackout from the Facility's ingress and egress, also demonstrating a lack of adequate BMPs.



*Photograph 1: Displays raw materials, industrial waste, and chemical containers outside, uncovered, during a rain event.*



Photo 17.  Upon closer inspection, there is some leftover stain in the covered gravel portion of the staining area.  Water is pooling by the southwest portion of the paved slab, and adjacent gravel area.

*Photograph 2: Displays "leftover stain" in the staining area during a rain event, evidencing improper spill and leak prevention and cleanup procedures. Caption by the Regional Board.*



Photo 29.  There is a large industrial waste bin full of various metals/materials.  This is completely exposed to storm water.

*Photograph 3: Displays a rusty dumpster and rusty metal waste, uncovered. Caption by the Regional Board.*



Photo 34.  Liquid filled containers are stored outdoors adjacent to the poly urea building and are not in secondary containment.  Residue is observed.

*Photograph 4: Displays chemical barrels with residue not in secondary containment. Caption by the Regional Board.*



*Photograph 5: Displays rusty inutile equipment uncovered.*



*Photograph 6: Google Earth Imagery showing significant trackout, including contaminated storm water, in March 2021.*

The Regional Board inspected the Facility in February 2026 and the photographs confirm that Facility continues to have onsite (1) rusty industrial storage tanks and containers, (2) significant particulate accumulation on impervious surfaces, (3) unmaintained/dense vegetation, (4) evidence of sumps lacking adequate capacity in drainage area #2, (5) industrial equipment stored outdoors without cover, (6) waste barrel not in containment, and (7) used, dirty pallets and poorly tarped industrial materials, among other evidence of poor housekeeping and BMPs.

Indeed, the frequency and amount of rain requires a significant focus on consistent BMP implementation and maintenance. Exhibit 1 reflects NOAA data from a nearby weather station that shows historical significant rain events (greater than 0.1in).

The Facility implements storm water containment and discharge reduction BMPs, including a detention basin and a bio swale.  However, the Facility's containment systems are not designed or maintained in compliance with Permit Section X.H or to the BAT/BCT standard. There is a lack of evidence that the containment systems consistently retains the volume of runoff produced from an 85th percentile 24-hour storm event, as calculated by a California licensed professional engineer. Thus, the bioswale fails to meet BAT/BCT standards.

Such poor housekeeping, failure to adopt adequate BMPs, and ineffective implementation of BMPs fail to constitute BAT/BCT and casts doubt on the efficacy of other BMPs identified in the SWPPP. Thus, the Facility has failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of Permit Effluent Limitation V.A. The Facility owners and/or operators have been in violation since at least May 4, 2021, and EarthSpotter and EDEN will update the dates of violations when additional information and data become available.

### 4.2 SWPPP and MIP Violations

The Permit requires that dischargers develop and implement a site-specific SWPPP and Monitoring Implementation Plan ("MIP") designed to reduce and prevent pollutants from contaminating storm water. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, develop and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and reduce or prevent the discharge of polluted storm water from industrial facilities.[12] The SWPPP should outline the necessary BMPs to meet BAT/BCT standards at the facility, based on site-specific conditions and pollutants, and must be revised as necessary to reflect any changes.

The SWPPP must include, at minimum, the following elements:

(1) A narrative description and summary of all industrial activities, potential pollutant sources, and potential pollutants;

---

[12] Permit § X.C.

(2) A site map showing the stormwater conveyance system, discharge points, flow direction, areas of actual or potential pollutant contact, nearby water bodies, and all pollutant control measures;

(3) A description of stormwater management practices;

(4) A description of the BMPs that will be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges;

(5) Procedures and BMPs for identifying and eliminating non-stormwater discharges;

(6) The locations where significant materials are shipped, stored, received, or handled, including typical quantities and handling frequency;

(7) A description of dust- and particulate-generating activities;

(8) A list of the individuals responsible for developing and implementing the SWPPP, along with their current roles;

(9) An MIP that identifies team members for monitoring tasks, discharge locations, visual observation and sampling procedures, and justification for alternative discharge locations or sampling reductions, and an example chain of custody.[13]

Dischargers must review their SWPPP at least once per year and update it as needed to remain in compliance with the Permit. Any significant revision to the SWPPP must be certified and submitted through SMARTS within 30 days.[14]

The Facility has failed and continues to fail to develop and implement a sufficient SWPPP and MIP, including an inadequate pollutant source assessment and BMPs section.

In particular, the SWPPP fails to:

(1) list all industrial materials onsite including locations where the material is stored, received, shipped, handled, the typical frequencies and quantities in violation of Permit Section X.F. In particular, the SWPPP lacks completeness. For example, the SWPPP's overview section names the five major chemicals used in the Facility's wood treating.[15] Nonetheless, the SWPPP does not list these chemicals, or any others used, in the industrial materials section.[16] Indeed, the industrial materials table generically states "treatment solutions" and the associated quantities and locations. The Permit requires a comprehensive list of specific industrial materials and requisite information for each material;[17]

(2) provide an adequate associated pollutant assessment for its activities in violation of X.G.2.ii. In particular, the SWPPP fails to identify all potential pollutants onsite based on its industrial processes. For example, the Facility uses fire retardant chemicals to treat wood, which contains phosphorus, and has rusty equipment and waste bins, which contains iron.[18] Given the Facility's toxic chemicals onsite, the Facility should also be

---

[13] Permit § X.A-I.

[14] Permit § X.A-I.

[15] SWPPP at § 1.2.

[16] SWPPP at Table 2.

[17] Permit § X.F.

[18] SWPPP at § 1.2; Regional Board Inspection photographs.

testing for chemical oxygen demand ("COD"). Nonetheless, the Facility fails to identify phosphorus, COD, and iron as associated pollutants and include the parameters in the MIP;

(3) provide site-specific BMPs and the associated narrative in violation of Permit Section X.H. For each BMP, the Facility must identify the pollutant that BMP is designed to reduce, the frequency or conditions when implemented, location, person responsible, equipment and tools necessary for the BMP, and procedures and instructions for the BMP. The Facility must also justify any minimum BMP not being implemented at the Facility. The SWPPP fails to comply with Permit Section X.H. As one example, the SWPPP fails to adequately address maintenance to on the storm water systems;

(4) identify all discharge locations that require sampling in violation of Permit Section X.I.2. The Facility has three drainage areas, two of which have the potential to discharge to the Receiving Waters and require sampling.

(5) identify on the site map all required parameters such as drainage areas #2 sampling location; clearly identify sampling location SP-1B; clearly identify the locations of past spills and leaks; accurately depict storm water flow in each drainage area; and identify all industrial storage areas onsite, among other deficiencies;

(6) include the required information for leaks and spills in violation of Permit Section X.G.d, such as approximate quantity, preventative measures, and all leaks in the required look back period;

(7) evaluate NSWDs. The Facility's SWPPP acknowledges NSWDs yet fails to identify the requisite information such as how they have been eliminated or the quantity or source of authorized discharges in violation of Permit Section X.G.e;

(8) note a factor of safety for the bio swale. The bioswale was "sized to accommodate an 85th percentile storm event." This suggests that the bio swale simply meets 85th percentile criteria. Nonetheless, the bioswale must also incorporate "A Factor of Safety. . . into the design of all treatment control BMPs to ensure that storm water is sufficiently treated throughout the life of the treatment control BMPs." SWPPP § H.6;

(9) comply with the MIP requirements under X.I. such as not containing a chain of custody form, field equipment specifics, and response procedures;

(10) include the SWPPP revision history as required by Permit Section X.A.10.

Notably, the 2026 SWPPP contains inaccurate characterizations of the Facility's Permit discharges. For example, the SWPPP claims that:

Under the Regional Water Quality Control Board framework, stormwater is classified as designated waste when it either (1) comes into direct contact with treated wood, treatment chemicals, or impacted soils associated with regulated objectives or benchmark levels. Therefore, stormwater that has not contacted treated wood, treatment chemicals, or impacted soils, and does not exhibit elevated pollutant concentrations, is managed as industrial stormwater in accordance with the IGP, and contact stormwater is regulated as designated waste under applicable Title 27 requirements.[19]

---

[19] SWPPP § 1.2.

This displays a misunderstanding of the interplay between the Permit and Title 27. The Permit does regulate waste, from anywhere on the Facility's grounds, regardless of the where the pollutants within that waste originated. Permit, Appendix C, "Storm Water Discharge Associated With Industrial Activity."

While it is true that the definition of Storm Water Discharges Associated With Industrial Activity does not include waste not regulated under a NPDES permit, what is regulated under a NPDES permit is not based on the character or origination of the waste. The Regional Board described this in a May 25, 2025 Legal Letter.[20] If the storm water discharges to the Receiving Waters, the discharge is regulated under the Permit. If the storm water discharges to the above ground storage tanks, surface impoundment, or the storm water retention basins, Title 27 Permit governs. Thus, the Facility lays an improper foundational narrative and displays a misunderstanding of Permit requirements resulting in numerous failures to comply with Permit. As one of many implicated provisions, this improper narrative violates Permit Sections X.C., X.D.2.a., and X.D.2.c.

While the Facility contains BMPs to reduce material tracking between drainage area #3 and drainage areas #1 and #2, the BMPs do not eliminate material tracking. For example, the Facility uses drainage area specific equipment. This does reduce material tracking, but the operator of the equipment is not drainage area specific and tracks materials. Indeed, the Facility's own sampling data supports material tracking. Thus, all three drainage areas are subject to the Permit.

Permit Section X.H. requires that the Facility develop and implement a SWPPP that complies with BAT/BCT.[21] Notably, the lack of sufficient minimum BMPs elucidated by the inspections in Section 4.1 *supra* also demonstrate a failure to comply with Permit Section X.H. Required BMPs include good housekeeping throughout the facility, preventive maintenance of equipment and systems used outdoors, spill and leak prevention and cleanup, proper material handling and waste management, maintenance of sufficient erosion and sediment controls, implementing and maintaining a sufficient employee training program and maintaining the efficacy of BMPs through quality assurance and proper record keeping.

In addition to minimum BMPs, dischargers are required to implement and maintain advanced BMPs, to the extent feasible, and if necessary to further reduce or prevent discharges of pollutants in the facility's storm water discharges.[22] Advanced BMPs include exposure minimization, storm water containment and discharge reduction and treatment control measures.[23] As discussed in Section 4.1 *supra*, has failed to comply with this mandate.

The Facility has failed to update its SWPPP in accordance with the requirements of the Permit. The Permit requires at least an annual analysis of SWPPP adequacy and an obligation to revise the SWPPP on an ongoing basis as needed. Any substantial SWPPP modification must be kept

---

[20] Attached as Exhibit 2.
[21] Permit § X.H.1.
[22] Permit § X.H.2.
[23] *Id*.

*Thunderbolt Wood Treating*

onsite and submitted to SMARTS within thirty days. However, despite the Facility's elevated pollutant levels in storm water discharges and being notified by the Regional Board of numerous Permit violations, the SWPPP remained unchanged between 2020 and 2026. Indeed, the Regional Board identified the need to upload a new SWPPP by March 21, 2025 and the Facility took until April 2026 to comply.[24] Thus, the Facility fails to revise the SWPPP on an ongoing basis.

Each day that the Facility operates without adequately developing, implementing, and revising the Facility's SWPPP is a separate and distinct violation of the Permit and CWA. Each day that the Facility operates without adequately developing, implementing, and revising the Facility's MIP is a separate and distinct violation of the Permit and CWA. Each day that the Facility fails to implement BAT/BCT under Permit Section X.H is a separate and distinct violation of the Permit and CWA. The Facility has operated and continues to operate without complying with the Permit's SWPPP and MIP requirements since at least May 4, 2021. The Facility is subject to civil penalties for all violations since that time. These violations are ongoing and EarthSpotter and EDEN will include additional violations when information becomes available.

### 4.3 Monitoring Violations

The Permit requires the Facility to monitor storm water discharges through (1) monthly visual observations, (2) sampling event observations, and (3) sampling its storm water runoff.[25] At least once per month, the Facility must inspect each drainage area for prior, current, or present unauthorized NSWDs, authorized NSWDs, and associated BMPs, and outdoor industrial activities and respective BMPs implementation. While sampling, the discharger shall observe whether the storm water had any floating or suspended materials, oil and grease, turbidity, odors, and potential sources of pollutants.

With respect to storm water sampling, a facility must collect four samples per reporting year: two during the first half of the reporting year (July 1–December 31) and two during the second half (January 1–June 30). If the facility participates in a compliance group, it is required to collect only one sample in each half of the reporting year (two total). All samples must be collected during a Qualified Storm Event ("QSE").[26] A QSE occurs when a precipitation event produces a "discharge for at least one drainage area; and . . . preceded by 48 hours with no discharge from any drainage area."[27] The sample must be collected within four hours of the start of the discharge or the "start of the facility operations if the QSE occurs within the previous 12-hour period."[28] The facility must monitor for (1) TSS, (2) oil and grease, (3) pH, (4) any SIC code specific parameters, (5) potential pollutants associated with the facility's industrial sources for which the Receiving Waters have 303(d) impairments or approved TMDLs, and (6) "identified by

---

[24] Regional Board February 21, 2025 letter.
[25] Permit § XI.
[26] Permit § XI.B.
[27] Permit § XI.B.1.
[28] Permit § XI.B.5.

the [d]ischarger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment," among others.[29]

The Facility has failed and continues to fail to collect and analyze its storm water discharges for all parameters required by the Permit. As discussed in Section 4.2 *supra*, the Facility should at least be testing for iron, phosphorus, and COD in addition to the identified parameters in the SWPPP.

The Facility has failed, and continues to fail, to collect the required four storm water samples each Reporting Year (see Table 1 below). This failure to obtain the requisite samples constitutes an ongoing and continuous violation of the Permit. Indeed, the Regional Board identified a failure to collect any storm water samples during the 2024-2025 reporting year, up to the time of inspection, as a Permit violation.[30] While the Facility did collect four samples during the 2024-2025 reporting year, all four were collected during the second half of the reporting year. The Facility is required to collect two samples during the first half of the reporting year.

| Reporting Year | Number of Dates Collected | Number Required |
|---|---|---|
| 2020-2021 | 1 | 4 |
| 2021-2022 | 2 | 4 |
| 2022-2023 | 4 | 4 |
| 2023-2024 | 1 | 4 |
| 2024-2025 | 4[31] | 4 |

*Table 1: Displays the number of samples collected by the Facility and the number required, per reporting year.*

The Facility has at least two sampling locations, potentially three depending on discharges from the driveway. The Facility has failed and continues to fail to identify and sample from all locations.

The Facility fails to follow the sampling collection procedures outlined in Attachment H. For example, the Facility fails to deliver the samples to the lab within 48 hours of collection.[32] Similarly, the Facility has failed to adequately train its employees on sampling procedures.

Permit Section X.H.f requires that the Facility train its Pollution Prevention Team to implement the Permit including BMP implementation, BMP effectiveness, visual observations, and

---

[29] Permit § XI.B.6.
[30] Regional Board February 21, 2025 letter.
[31] The Facility collected all four samples in the second half of the reporting year.
[32] *E.g.* March 5, 2025 sampling event lab report.

monitoring activities. Given the numerous deficiencies discussed in Section 4, the Facility has failed to adequately train its Pollution Prevention Team.

As discussed in Sections 4.2 *supra*, the Facility has failed to implement BMPs sufficient to prevent the discharge of pollutants. As a result, the Facility has also failed to conduct adequate monitoring as required by the Permit, including performing the required monthly visual observations of BMPs implementation. Indeed, the Regional Board identified a failure to comply with Permit Section X.H.1 for numerous reasons including the storage of rust equipment and material, evidence of leaks and spills, and improper chemical handling and storage.

Each failure to conduct monitoring in accordance with the Permit constitutes a separate and distinct violation of the CWA and the Permit. The Thunderbolt Facility has operated, and continues to operate, without adequate monitoring since at least May 4, 2021, and is subject to civil penalties for all such violations occurring from that date forward. These violations are ongoing, and EarthSpotter and EDEN will identify and include additional violations as further information becomes available.

### 4.4 Failure to Upload Accurate Documents to SMARTS

Each year, by July 15th, the discharger "shall certify and submit via SMARTS an Annual Report."[33] The Annual Report shall include: (1) a compliance checklist indicating the facility complied with and "addressed all applicable requirements" of the Permit, (2) an explanation for any non-compliance, (3) any SWPPP amendments within the reporting year, and (4) the date of the Annual Evaluation.[34] The Annual Evaluation consists of a single comprehensive review of the facility's storm water practices, including an assessment of the prior year's sampling, visual monitoring, and observation records; an inspection of the facility's industrial activities and associated potential pollutants; an examination of drainage areas; an evaluation of any new BMPs and related equipment; and a review of the overall effectiveness of the BMPs.[35]

The Annual Report must be signed by the Facility's Legally Responsible Person or their Duly Authorized Representative.[36] CWA "[S]ection 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both."[37]

The Facility has submitted multiple Annual Reports, each accompanied by certifications asserting that the Facility was in compliance with various provisions of the Permit. However, as outlined in Section 4 of this Letter, the Facility has violated—and continues to violate—numerous provisions of the Permit, including these same provisions. Thus, these certifications

---

[33] Permit § XVI.A.
[34] Permit § XVI.B.
[35] Permit § XV.
[36] Permit § XXI.K.
[37] Permit § XXI.N.

*Thunderbolt Wood Treating*

are erroneous and the Facility's Legally Responsible Person and/or Duly Authorized Representative should have known the Facility failed to comply with Permit requirements and these certifications were false.

Similarly, as discussed throughout Section 4, the Facility has failed to upload numerous accurate and complete documents to SMARTS including SWPPPs and Site Maps.

The Facility's failure to meet the Permit's reporting obligations, along with the submission of false or misleading information, places the Facility in ongoing, daily noncompliance with the Permit. Each day that the Facility continues operations without submitting the required reporting constitutes a separate and distinct violation of the Permit and CWA. The Facility has been in continuous daily violation of the Permit's reporting requirements since at least May 4, 2021. These violations continue, and EarthSpotter and EDEN will identify additional violations as new information becomes available.







## 6. Conclusion

EarthSpotter and EDEN remain open to discussing appropriate measures to address the violations outlined in this Letter. Nevertheless, once the applicable notice period concludes, EarthSpotter and EDEN intend to initiate a citizen enforcement action under Section 505(a) of the CWA based on the Facility's violations of the Permit and under Section 7002(a)(1)(B) for RCRA violations.

If you wish to engage in settlement discussions, please contact counsel for EarthSpotter and EDEN:

| EarthSpotter | EDEN |
| --- | --- |
| Natalie Marcin<br>General Counsel<br>EarthSpotter<br>2801 B St., Unit 2006<br>San Diego, CA  92102<br>(301) 751 7554 | Adam D. Brumm, Esq.<br>responses@edendefenders.org<br>Central Valley Eden Environmental<br>Defenders, LLC<br>1520 E. Covell Blvd, Suite B5<br>Davis, CA 95616<br>(800) 545-7215, extension 906 |

Sincerely,

Natalie Marcin
Attorney for EarthSpotter

EDEN Environmental Defenders

Service List

*Via U.S. Mail*

| | |
|---|---|
| Patrick Pulupa<br>Executive Officer<br>Central Valley Regional Water Quality Control Board<br>11020 Sun Center Drive #200<br>Rancho Cordova, California 95670 | Lee Zeldin, Administrator<br>Environmental Protection Agency<br>Office of the Administrator 1101A<br>1200 Pennsylvania Ave N.W.<br>Washington, DC 20460 |
| Mike Martucci<br>Acting Regional Administrator<br>U.S. Environmental Protection Agency<br>Region IX<br>75 Hawthorne Street<br>San Francisco, California 94105 | Eric Oppenheimer<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, California 95812 |
| Leonard Lovalvo<br>Agent for Service of Process<br>THUNDERBOLT WOOD TREATING CO., INC.<br>3400 Patterson Rd<br>Riverbank, California 95367 | Katherine Butler<br>Director<br>Department of Toxic Substances Control<br>P.O. Box 806<br>Sacramento, California, 95812 |

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-05 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-04 | 0.28 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-03 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2026-01-01 | 0.75 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-12-26 | 0.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-12-25 | 0.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-12-24 | 0.66 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-18 | 0.88 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-17 | 0.55 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-16 | 1.52 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-14 | 0.58 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-11-13 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-10-15 | 0.84 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-10-14 | 1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-09-25 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-04-26 | 0.38 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-04-02 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-18 | 0.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-17 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-15 | 0.51 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-14 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-13 | 1.01 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-06 | 0.37 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-05 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-03-03 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-14 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-13 | 0.99 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-07 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-05 | 0.64 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-04 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-02-01 | 0.2 |

Exhibit 1: Precipitation Data

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2025-01-04 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-30 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-27 | 0.74 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-25 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-24 | 0.21 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-23 | 0.2 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-22 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-17 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-15 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-14 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-12-12 | 0.47 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-26 | 0.14 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-25 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-23 | 0.53 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-11-12 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-05-05 | 0.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-04-14 | 1.02 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-04-05 | 0.78 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-04-01 | 0.28 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-30 | 0.7 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-24 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-23 | 0.34 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-04 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-03 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-03-02 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-21 | 0.23 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-19 | 0.71 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-18 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-15 | 0.61 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-08 | 0.63 |

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-06 | 0.14 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-05 | 0.98 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-04 | 0.36 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-03 | 0.14 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-02 | 0.27 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-02-01 | 1.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-25 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-24 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-23 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-22 | 1.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-21 | 0.34 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-20 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-17 | 0.52 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-14 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-11 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-07 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2024-01-03 | 0.55 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-30 | 0.81 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-28 | 0.31 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-21 | 0.42 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-20 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-19 | 0.21 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-12-18 | 0.33 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-11-19 | 0.52 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-11-18 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-10-23 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-05-03 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-30 | 0.23 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-29 | 0.58 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-23 | 0.34 |

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-22 | 0.39 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-21 | 0.19 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-20 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-15 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-14 | 0.28 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-13 | 0.53 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-12 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-11 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-10 | 0.96 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-06 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-05 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-03-01 | 0.41 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-28 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-27 | 0.61 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-25 | 0.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-24 | 0.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-06 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-02-05 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-30 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-19 | 0.13 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-16 | 1.69 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-15 | 0.53 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-14 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-12 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-11 | 0.36 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-10 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-09 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-08 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-06 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-05 | 0.35 |

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-03 | 0.43 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2023-01-01 | 1.67 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-31 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-30 | 0.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-29 | 0.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-28 | 0.78 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-27 | 1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-12 | 0.26 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-11 | 1.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-04 | 0.78 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-12-02 | 0.68 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-11-09 | 0.32 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-11-08 | 0.31 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-11-07 | 0.24 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-04-22 | 0.16 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-04-21 | 0.18 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2022-03-28 | 0.48 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-29 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-28 | 0.38 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-27 | 0.22 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-26 | 0.46 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-24 | 1.12 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-22 | 0.11 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-16 | 0.3 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-14 | 1.63 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-13 | 0.64 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-09 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-12-07 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-11-09 | 0.21 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-26 | 0.22 |

Exhibit 1: Precipitation Data

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-25 | 3.03 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-24 | 0.18 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-23 | 0.17 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-10-22 | 0.48 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-19 | 0.23 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-16 | 0.1 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-15 | 0.18 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-03-10 | 0.25 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-02-12 | 0.4 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-02-03 | 0.65 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-29 | 1.31 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-28 | 1.6 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-27 | 0.99 |
| US1CASS0006 | MODESTO 4.1 NW, CA US | 2021-01-25 | 0.15 |

Exhibit 1: Precipitation Data

# Exhibit 2



**GAVIN NEWSOM**
GOVERNOR

**YANA GARCIA**
SECRETARY FOR
ENVIRONMENTAL PROTECTION

# Central Valley Regional Water Quality Control Board

21 May 2025

Michael C. Normoyle, Esq.
P.O. Box 157
Nipomo, CA 93444
(209) 602-9308
Email: m.normoyle@mcnlegal.com

Leonard Lovalvo
Thunderbolt Inc.
3400 Patterson Road
P.O. Box 890
Riverbank, California 95367

**RESPONSE TO COMMUNICATIONS FROM THUNDERBOLT INC. FACILITY, 3400 PATTERSON ROAD, RIVERBANK, STANISLAUS COUNTY**

Dear Mr. Lovalvo and Mr. Normoyle:

The Central Valley Regional Water Quality Control Board ("Central Valley Water Board" or "Board") regulates discharges of waste from the Thunderbolt Wood Treating Company, Inc. ("Thunderbolt" or "Discharger") facility at 3400 Patterson Road, Riverbank, Stanislaus County, 95367. These discharges are regulated under two waste discharge requirements ("WDRs") orders:

1. Central Valley Water Board WDRs Order R5-2010-0125 ("2010 WDRs"); and

2. State Water Resources Control Board Order WQ 2014-0057-DWQ, as amended by Order WQ 2018-0028-DWQ, *General Permit for Storm Water Discharges Associated with Industrial Activities*, NDPES No. CAS000001 ("Industrial General Permit" or "IGP") (WDID 5S50I028660).

On 30 January 2025, Central Valley Water Board staff inspected the Thunderbolt facility. Enclosed with this correspondence is an Inspection Report documenting the January 2025 inspection.

Additionally, this correspondence responds to four recent communications received from Thunderbolt representatives: a 29 January 2025 letter from Thunderbolt's counsel, Michael Normoyle, a 18 February 2025 letter from Thunderbolt's CEO, Leonard Lovalvo, a 17 March 2025 follow-up letter from Mr. Lovalvo, and a 17 April 2025 follow-up letter from Mr. Normoyle. The responses below to the January and February letters

Thunderbolt Inc. Riverbank, CA.         - 2 -                    21 May 2025

are also intended to respond to the follow-up March and April letters, as those subsequent letters simply reiterate points raised in the earlier correspondence.

**29 January 2025 Letter from Michael Normoyle**

In his letter of 29 January 2025, Mr. Normoyle raised concerns with the Central Valley Water Board's current regulation of Thunderbolt's operations and proposed a plan for updating those regulatory measures. The Board staff does not entirely agree with Mr. Normoyle's characterization of its current regulatory scheme but appreciates Mr. Normoyle's analysis of perceived issues; Board staff will keep counsel's feedback under consideration as they continue to revise its regulation of the Thunderbolt facility.

Historically, the Central Valley Water Board has regulated the Thunderbolt facility via the 2010 WDRs, which implements applicable requirements of California Code of Regulations, title 27 ("Title 27") for collection, storage, and disposal of designated wastes.[1] Thunderbolt uses a variety of chemicals in its wood-treating operations. While many of these chemicals are captured within the final treated wood product, residual quantities of these chemicals remain on production surfaces, treated wood products, and surfaces used for treated wood storage. According to the 2010 WDRs, storm water that falls onto the production and storage areas, and products therein, ("contaminated storm water") is routed into aboveground tanks, while storm water that falls outside of these areas ("clean storm water") is routed into the surface impoundment (2010 WDRs, Findings 20-21). However, historic sampling of the water stored in the surface impoundment indicates that the "clean storm water" therein actually contains wood-treating chemicals in concentrations that exceed applicable water quality objectives ("WQOs"). (2010 WDRs, Finding 5.) As a result, the Central Valley Water Board determined that the water contained in the tanks and the surface impoundment constitutes designated waste subject to regulation under Title 27.

The 2010 WDRs were also developed on the basis that the Thunderbolt facility was allegedly "designed specifically to contain all storm water onsite." (See 2010 WDRs, Finding 48.) Accordingly, the 2010 WDRs deemed the Thunderbolt facility exempt from regulation under the IGP (*ibid*) and prohibited all offsite discharges of stormwater, as well as any discharges of stormwater runoff containing wood treating chemicals to any location other than process sumps or the surface impoundment. (*Id.,* Prohibitions A.7 and A.4.)

In his letter, Mr. Normoyle proposes a shift in regulatory coverage based on a proposed plan to cease diversions of stormwater to the surface impoundment, progressively empty the surface impoundment, and then clean and (presumably) cease use of the surface impoundment by September 2025. In the short-term, Discharger would adjust its processes to fit within and comply with the IGP while maintaining coverage under the 2010 WDRs for the wastes captured and contained in the surface impoundment. In the

---

[1] Pursuant to Water Code section 13173, "Designated Waste" is nonhazardous waste that consists of or contains pollutants that, if released from the surface impoundment or tanks to the environment, could cause exceedances of applicable WQOs or otherwise affect the designated beneficial uses of any receiving water(s) (Wat. Code, § 13173)

Thunderbolt Inc. Riverbank, CA.          - 3 -                              21 May 2025

long-term, the Discharger would cease its Title 27-related activities, seek termination of the 2010 WDRs, and proceed with operations subject only to the IGP and no other WDRs.

Central Valley Water Board staff agrees with Mr. Normoyle that IGP coverage is appropriate for regulation of discharges of industrial storm water from the industrial process and storage areas of Thunderbolt's facility into the City of Riverbank's ("City") municipal storm water sewer system ("MS4") or other conveyances to waters of the United States ("WOTUS"). Board staff also appreciates the steps that Thunderbolt has taken thus far to accommodate a regulatory transition. However, as discussed below, several issues must be resolved before the Board can move forward with the proposed change.

First, IGP coverage is not appropriate for certain aspects of Thunderbolt's operations as they currently exist – specifically, (1) discharges of industrial storm water to unlined storm water basins for the purpose of disposal via percolation to underlying groundwater; (2) collection, storage, and reuse of industrial storm water that, if discharged from the surface impoundment[2] or tanks due to overtopping, containment failure, etc., could result in pollution of groundwater and/or creation of nuisance conditions (see Wat. Code, § 13050(l)-(m)); and/or (3) discharges of industrial storm water and/or wastewater to the City's sanitary sewer system.

1.  Unlined Storm Water Basin

The IGP does not regulate discharges of waste to percolation ponds. (IGP, Fact Sheet, § II.A.2.d.ii.) During the January 2025 inspection, Central Valley Water Board staff observed and were informed that a proportion of the Thunderbolt facility's storm water is directed to an unlined basin, from which it percolates to underlying groundwater. Central Valley Water staff further observed that a concrete berm separating the production area from the percolation pond had been cut, creating potential for runoff from the production area to enter the percolation pond. As a result, Staff suspect that industrial storm water has been, and may still be, discharged into the percolation pond in violation of both the 2010 WDRs and the IGP.

Unauthorized discharges of waste to groundwater may subject the Discharger to enforcement action including administrative civil liability (i.e., monetary penalties), legal directives to investigate and remediate groundwater pollution caused by historic and ongoing discharges, and/or termination of authorization to discharge waste altogether. (See Wat. Code, §§ 13260-13265, 13267, 13304, 13350.)

2.  Collection and Storage of Industrial Storm Water in Surface Impoundment

---

[2] As further discussed below, the Board acknowledges Thunderbolt's proposed plan to decommission the surface impoundment and tentatively agrees that, upon doing so, Title 27-based requirements will no longer be applicable to the Facility.

The IGP does not regulate discharges to evaporation ponds, or any other methods used to retain and prevent industrial storm water discharges from entering WOTUS. (IGP, § II.A.2.d.ii.) Accordingly, Thunderbolt's collection and storage of industrial storm water in the surface impoundment and tanks is not eligible for coverage under the IGP. The Central Valley Water Board has discretion to determine whether to prescribe WDRs regulating this type of activity. Since 2010, the Board has regulated the surface impoundment pursuant to Title 27 because the chemicals contained therein could, if discharged due to spill, overflow, or other unplanned release scenario, pollute underlying groundwater and/or cause nuisance conditions. Although, as Mr. Normoyle asserts, the water and chemicals contained in the surface impoundment are used as a valuable part of Thunderbolt's processes, those materials constitute waste when they are discharged or released from the surface impoundment to the environment.  Analogously, fuel oil stored in a tank for later use may not constitute waste while it remains in the tank, but that characterization would change if the oil was released in a manner that impacted or threatened water quality.

Unless or until it can be demonstrated that the water stored in the surface impoundment does not meet the definition of designated waste, the Board will maintain its regulation of the surface impoundment pursuant to Title 27. As described in the Board staff's 18 September 2024 *Incomplete Report of Waste Discharge* letter, samples collected from the surface impoundment between 2021-2024 show that it contains concentrations of arsenic, chromium, and other wood-treating chemicals in excess of respective WQOs. These data support the Board's conclusion that the contents of the surface impoundment constitute a designated waste. Even if some of this water can be used and/or discharged in a manner(s) that does not impact water quality, regulation of the surface impoundment pursuant to Title 27 remains appropriate due to the potential for pollution posed by this operational practice.

If and when Thunderbolt ceases to store designated waste in the surface impoundment, as Mr. Normoyle has proposed, Title 27-based regulatory requirements will likely no longer apply to Thunderbolt's operations. However, the Central Valley Water Board may still impose WDRs beyond those specified in the IGP if Thunderbolt's operations continue to involve discharges of waste outside the scope of IGP coverage or if other factors support a conclusion that IGP coverage is insufficient for protection of the state's waters.

3.  Discharges to the City of Riverbank's Sanitary Sewer System

The IGP does not regulate discharges to sanitary sewer systems (IGP, § II.A.2.d.i) and the Central Valley Water Board generally does not regulate such discharges. However, the Board does regulate discharges to the environment from the City's sanitary sewer and Wastewater Treatment Facility ("WWTF") under WDRs Order 94-100.

Thunderbolt Inc. Riverbank, CA.          - 5 -                                    21 May 2025

To achieve Thunderbolt's stated objective of being regulated solely by the IGP, it must ensure that it is no longer discharging waste to groundwater via the percolation pond and to the surface impoundment. If these non-IGP discharges continue, then additional WDRs will likely remain necessary. Additionally, if Thunderbolt intends to discharge wastes to the City's sanitary sewer, it should coordinate with the City to establish a program to ensure that such discharges will not impair City operations or cause water quality impacts. Unauthorized discharges of waste to City sanitary sewers that cause or threaten to cause conditions of pollution or nuisance may give rise to liability for Thunderbolt pursuant to Water Code section 13304 or other authorities.

Second, for Thunderbolt to proceed with only IGP coverage for its operations, it must comply with the IGP. The Central Valley Water Board is authorized to deny, rescind, and modify dischargers' IGP coverage and/or to determine that additional or replacement WDRs are more appropriate for regulating any facility within its jurisdiction. (See IGP, § XIX; and see Wat. Code, § 13263.) While instances of noncompliance with IGP requirements will not necessarily result in termination of IGP coverage or issuance of additional or replacement WDRs, recurring and/or unresolved violations may serve as a basis for such action.

Thunderbolt was enrolled under the IGP on 22 May 2020. Since then, the facility's annual Numeric Action Level ("NAL") for Copper ("Cu") has significantly exceeded the U.S. EPA's benchmark of 0.0332 mg/L. Based on Ad Hoc Reports submitted to Thunderbolt's SMARTS account, the facility's annual NAL for Cu has been as follows:

| | |
|---|---|
| 2019-2020 | 0.1284 mg/L (Level 1) |
| 2020-2021 | 0.0523 mg/L (Level 2) |
| 2021-2022 | 0.06165 mg/L (Level 2) |
| 2022-2023 | 0.06947 mg/L (Level 2) |
| 2022-2023 | 0.103 mg/L (Level 2) |

Thunderbolt's 11 January 2024 *Exceedance Response Action Level 2 Technical Report (Update)* acknowledged this issue and stated that, to address this recurring exceedance, Thunderbolt would construct a bioswale and retention basin by July 2024. As of May 2025, the bioswale and retention basin have not been constructed. As a result, the Central Valley Water Board anticipates that further Cu NAL exceedances will occur. Failure to implement IGP requirements and noncompliant conduct causing water quality impacts may result in monetary penalties, as well as modification, supplementation, or termination of Thunderbolt's WDRs. Specific instances of

Thunderbolt Inc. Riverbank, CA.                 - 6 -                                  21 May 2025

noncompliance and potential penalties will be addressed under separate cover, such as through issuance of NOVs or other enforcement-related correspondence, as appropriate.

**Leonard Lovalvo's 18 February 2025 Request to Rescind 20 November 2016 NOV**

In his letter of 18 February 2025, Leonard Lovalvo requested that the Central Valley Water Board rescind a 20 November 2016 NOV issued to the City WWTF. This 2016 NOV notified the City that it had violated Prohibition A.3 of its WDRs when it accepted and discharged to groundwater industrial wastewater generated at Thunderbolt. The NOV instructed the City to (1) "immediately cease receiving effluent from [Thunderbolt] until it is shown the discharge complies with Discharge Prohibition A.3…" and (2) monitor receiving groundwater for listed constituents known to be associated with wood treating. The Central Valley Water Board understands that the City implemented these requirements and invoiced Thunderbolt for the costs of the required groundwater monitoring. Mr. Lovalvo's February 2025 letter requests that the 2016 NOV be rescinded so that the City will no longer be required to conduct groundwater monitoring for wood treating-related constituents and, thus, Thunderbolt will no longer be invoiced for those monitoring costs.

The Central Valley Water Board does not intend to rescind the 2016 NOV. NOVs serve to notify recipients of potential liabilities and create a record of noncompliance with water board orders or other legal requirements. The Central Valley Water Board generally does not rescind NOVs unless they have been issued in error. In this case, there is no indication that the 2016 NOV was issued to the City in error; thus, Central Valley Water Board declines to rescind the NOV.

Nevertheless, the Central Valley Water Board is aware that circumstances surrounding Thunderbolt's and the City's operations have evolved in the time since the 2016 NOV was issued. The Board intends to issue revised Monitoring and Reporting Program Orders ("MRPs") to revise and replace both parties' monitoring requirements, as specified in the parties existing WDRs/MRPs and the 2016 NOV. These updated monitoring requirements are intended to provide an improved understanding of both facilities' waste discharges and to ensure protection of water quality.

Should you have any questions regarding this matter, please contact Paul Sanders at (916) 464-4817 or at paul.sanders@waterboards.ca.gov, or Howard Hold at (916) 464-4679 or at howard.hold@waterboards.ca.gov.

Sincerely,

John J. Baum
Assistant Executive Officer

Thunderbolt Inc. Riverbank, CA.                    - 7 -                                  21 May 2025


Enclosures:
        January 2025 – Storm Water Industrial General Permit Inspection Report


cc: via email
Alex Flores, Thunderbolt Inc., alex@thunderboltwt.com
Norik Naraghi, Esq., Downey Brand LLP, nnaraghi@downeybrand.com
Kari Casey, WHF, Inc, karicasey@whfinc.com
Christopher Moskal, Central Valley Water Board, christopher.moskal@waterboards.ca.gov
John Murphy, Central Valley Water Board, john.murphy@waterboards.ca.gov
Paul Sanders, Central Valley Water Board, paul.sanders@waterboards.ca.gov
Howard Hold, Central Valley Water Board, howard.hold@waterboards.ca.gov
Lowell Cottle, Central Valley Water Board, lowell.cottle@waterboards.ca.gov
Kari Holmes, Central Valley Water Board, kari.holmes@waterboards.ca.gov